**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH DAKOTA**

| | |
|---|---|
| In re:<br><br>Northern Beef Packers Limited Partnership<br>SSN/ITIN 26-2530200<br><br>Debtor. | Bankr. No. 13-10118<br>Chapter 11<br><br>DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING: (A) SECURED POST-PETITION FINANCING ON A SUPER PRIORITY BASIS PURSUANT TO 11 U.S.C. § 364, (B) USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (C) GRANT OF ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 363 AND 364, AND REQUEST FOR PRELIMINARY HEARING |

  Debtor Northern Beef Packers Limited Partnership ("Debtor") hereby moves the Court for the above-captioned relief, including a preliminary hearing and a final hearing on this motion, as needed, and in support thereof respectfully states:

  1. On July 19, 2013, the Debtor filed a petition seeking relief under chapter 11 of the Bankruptcy Code.

  2. Any hearing on the Debtor's request for an interim order shall be set by separate order, in the Court's discretion. In the event the Court schedules such a hearing, the Debtor will serve notice of such hearing on the parties identified in the attached certificate of service. A hearing on the Debtor's request for a final order shall also be set by separate order, but only if an objection is timely filed with the Court.

3.     Local Rule 2002-1(f) provides certain guidelines for responses and objections to this Motion.  As the Debtor is seeking expedited relief, with respect to the request for entry of an interim order, the Debtor does not object to written responses being served and filed immediately prior to the hearing.  Any response to the request for a final order must be filed and delivered on or before a date that will be later designated by the Court.  UNLESS A RESPONSE OPPOSING THE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE MOTION WITHOUT A HEARING.

4.     The Debtor is a debtor in possession under sections 1106 and 1107 of the Bankruptcy Code. No committee of unsecured creditors has been appointed, and no motion for appointment of a trustee or examiner has been filed in this bankruptcy case.

5.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§157 and 1334.  This is a core proceeding pursuant to 28 U.S.C §157(b).  Venue is proper in this Court pursuant to 28 U.S.C. §§1408 and 1409.

6.     This motion arises under sections 361, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 364(e) of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

7.     The Debtor is a South Dakota limited partnership that owns and operates a newly-constructed 420,000 square foot beef processing facility in Aberdeen, South Dakota.

8.     Production at the Aberdeen facility commenced in October, 2012.  In April, 2012, as a result of inadequate working capital, the Debtor was forced to scale back operations and lay off 108 employees.  From April through June, the Debtor was harvesting approximately 200 head per day.

9. The Debtor has been unable to fund cattle purchases that would enable it to reach production levels sufficient to generate the revenue needed to service its outstanding debt and fund ordinary operations.[1]

10. On March 20, 2013, White Oak Global Advisors, LLC, in its capacity as agent for the Debtor's senior secured pre-petition lenders ("White Oak"), gave notice of default under the Loan and Security Agreement, dated as of September 10, 2012. Since that time, the Debtor has been engaged in negotiations with its major secured creditor regarding resolution of the creditor's claim, and engaged the services of a financial advisor.

11. As a result of the negotiations, and with the assistance of its financial advisor, the Debtor decided to commence this bankruptcy case in order to maximize the value of the Debtor's estate, most likely through an asset sale pursuant to section 363 of the Bankruptcy Code.

12. The Debtor has been working with its financial advisor to identify a suitable purchaser, and to negotiate the terms of a "stalking horse" bid for purposes of the section 363 sale. As of the Petition Date, no such bid had been reduced to a formal agreement, but the Debtor anticipates that it will seek approval of a stalking horse bid and sale procedures within the next three to four weeks.

13. Shortly before the Petition Date, the Debtor suspended beef processing operations, but it has, to the best of its ability, maintained its assets and facilities in a condition to attract the highest and best offer.

---

[1] As the Debtor's cattle purchases are subject to the prompt payment provisions of the Packers and Stockyards Act of 1921 (7 U.S.C. §181), however, the Debtor is unable to increase production by resort to the sort of vendor financing available in many other industries.

14. The Debtor is not generating revenues, and it has no significant inventory or outstanding accounts receivable. In order to fund the ongoing operations necessary to maintenance of its property and administer this bankruptcy case, it requires post-petition financing.

15. Prior to the Petition Date, the Debtor began communicating with various potential lenders, including current investors and creditors. A number of parties expressed interest, and the Debtor continued negotiating potential financing transactions that would have provided for continuing production operations, but as of the date of this motion, only White Oak had made a firm commitment to provide financing. Because the Debtor's need for financing is urgent, it determined that accepting the White Oak offer was in the best interests of the estate.

16. In addition to the terms described below, White Oak's offer provided that: (i) any financing would only be made available as Court-approved debtor-in-possession financing in a chapter 11 bankruptcy case; and (ii) would have to be provided on a secured basis. Based on the Debtor's communications with potential lenders, financing was not available on an unsecured or administrative expense basis nor on any more favorable terms than being offered by White Oak.

### 1. Interim Relief

17. Debtor seeks approval of post-petition financing in an amount of up to $4,900,000 terms described below. The funds borrowed will be used by the Debtor to maintain its property and to pay the costs of administration of this bankruptcy case.

18. Pursuant to Fed.R.Bankr.P. 4001(c)(2) and Bankr. D.S.D. R. 4001-3, the Debtor requests preliminary authority to obtain secured credit of $600,000.00 during the period ending August 17, 2013 (the "Interim Period"). Details of the critical expenses that must be paid during the Interim Period are set forth in the Budget attached hereto as Exhibit A.

19. The Debtor has no other immediately available source of monies from which these critical expenses may be funded. All funds borrowed during the Interim Period will be used to pay necessary costs and expenses required to avoid immediate and irreparable harm. If the Debtor is not able to obtain relief on an expedited basis, it will be unable to staff its facility or make such payments as are necessary to ensure that its property is adequately maintained, including, but not limited to, payments of deposits to utility service providers.

## 2. Terms of Post-Petition Financing

20. The terms of the post-petition financing are set forth in the Interim Order and the Senior Secured, Super-Priority Debtor-In-Possession Loan and Security Agreement (the "DIP Agreement"), attached hereto as Exhibit B, exclusive of exhibits, and the proposed interim order (the "Interim Order"),[2] attached hereto as Exhibit C. The material terms of the financing, along citations to the relevant provisions in the DIP Agreement and the Interim Order,[3] are as follows:

   A. White Oak will loan the Debtor up to $4,900,000.00 (the amount advanced, together with principal, accrued and unpaid interest thereon, and costs and expenses, shall be referred to as the "DIP Indebtedness"), of which $600,000.00 will be available upon entry of the Interim Order and $4,300,000.00 will be loaned following entry of the Final Order. (Interim Order ¶ 3; DIP Agreement § 2.3(c), Schedule 5.8).

   B. The Debtor shall pay a financing fee in the amount of $62,500.00 out of the initial advance under the DIP Agreement. (Interim Order ¶ 5; DIP Agreement § 2.4).

   C. Interest will accrue on the outstanding principal under the DIP Agreement at the rate of 16% per annum. (DIP Agreement § 2.2(a), definition of Postpetition Base Rate).

   D. On a monthly basis, the Debtor shall pay to White Oak: (i) accrued interest; and (ii) White Oak's reasonable out of pocket expenses, including reasonable consultants', attorneys' and paralegals' fees, costs and expenses. (DIP Agreement § 2.2(a), Interim Order ¶ 5).

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Interim Order.

[3] The summary in not intended to be an exhaustive or complete description of the terms of the Interim Order and the DIP Agreement, and in the event of any inconsistency, the terms of the Interim Order and DIP Agreement shall control over the summary.

E. The DIP Indebtedness shall be entitled to super-priority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code. (Interim Order ¶ 13).

F. All indebtedness under the DIP Agreement will be secured by a security interest in all pre- and post-petition property of the Debtor, including all causes of action arising under §§ 502(d), 544, 545, 547, 548, 549, 550 and 551 of the Bankruptcy Code and including all proceeds therefrom. (Interim Order ¶ 7).

G. The security interest securing the Debtor's obligations under the DIP Agreement will be, pursuant to sections 363, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, a first priority security interest in all assets other than those assets that are subject to Permitted Senior Liens (as defined below). (Interim Order ¶ 7).

H. Upon entry of the Final Order, $2,500,000 of outstanding Pre-Petition Indebtedness shall be converted dollar-for-dollar to indebtedness under the DIP Agreement. (Interim Order ¶ 7).

I. The security interest securing the Debtor's obligations under the DIP Agreement will be subject to a carve-out for payment of: (i) fees payable to the Clerk of the Court and the Office of the United States Trustee; (ii) allowed fees and expenses incurred by attorneys retained by the Debtor in an aggregate amount not to exceed $300,000; and (iii) allowed fees and expenses incurred by other professionals retained by the Debtor, all as more fully set forth in the Interim Order. (Interim Order ¶ 14).

J. Until the occurrence of a Termination Date, the Debtor shall be entitled to use cash collateral, as that term is defined in section 363 of the Bankruptcy Code. (Interim Order ¶¶ 2, 3).

K. Upon entry of the Final Order, the Debtor shall be deemed to have waived any and all claims against White Oak, and to have waived defenses as to the validity, perfection, priority, enforceability and nonavoidability (under §§ 510, 544, 545, 547, 548, 550, 551, 552 or 553 of the Bankruptcy Code or otherwise) of the Pre-Petition Indebtedness and the security interests in and liens on the Pre-Petition Collateral. (Interim Order, ¶ 25). The waivers in ¶ 25 shall be binding on other parties in interest, including any committee that may be appointed, 30 days after the Petition Date. (Interim Order, ¶ 27).

L. The post-petition financing and consensual use of cash collateral shall terminate following on the earliest to occur of the following (the "Termination Date"): the (i) the Final Hearing Date or, if a Final Order is entered on or before the Final Hearing Date, October 19, 2013 (subject to extension upon the written agreement of the Agent and Lenders); (ii) the date of final indefeasible payment and satisfaction in full in cash of the Indebtedness; (iii) the Debtor files any motion with the Court seeking authority to sell the Debtor's business or any of Debtor's assets outside of the ordinary course of business without the prior written consent

6

    of the Agent (which consent may be withheld in its sole discretion), or the entry of an order by the Court authorizing the sale of the Debtor's business or any of Debtor's assets outside of the ordinary course of business without the prior written consent of the Agent (which consent may be withheld in its sole discretion); (iv) the occurrence of any violation by the Debtor of the Interim Order or the terms in any of the DIP Loan Documents, or the Final Order, or any Event of Default (as defined in the Pre-Petition Credit Agreement) other than the Existing Defaults; (v) the dismissal of the Chapter 11 Case or the conversion of the Chapter 11 Case into a case under Chapter 7 of the Bankruptcy Code; (vi) a trustee or an examiner is appointed in the Chapter 11 Case without the prior written consent of the Agent (which consent may be withheld in its sole discretion), or the Debtor applies for, consents to, or acquiesces in, any such appointment without the prior written consent of the Agent (which consent may be withheld in its sole discretion); (vii) the Interim Order or the Final Order is stayed, reversed, vacated, appealed, amended or otherwise modified in any respect without the prior written consent of the Agent (which consent may be withheld in its sole discretion); (viii) this or any other Court enters an order or judgment in the Chapter 11 Case modifying, limiting, subordinating or avoiding the priority of any Indebtedness or the perfection, priority or validity of the Agent and Lenders' pre-petition or post-petition liens on any DIP Collateral or imposing, surcharging or assessing against the Agent or Lenders or its claims or any DIP Collateral any costs or expenses, whether pursuant to § 506(c) of the Bankruptcy Code or otherwise; (ix) the Debtor files any application for approval or allowance of, or any order is entered approving or allowing, any administrative expense claim in the Chapter 11 Case, having any priority over, or being *pari passu* with, the superadministrative priority of the DIP Indebtedness; (x) an order is entered in the Chapter 11 Case granting relief from the automatic stay of Section 362 of the Bankruptcy Code to any holder or holders of a lien on any material collateral in allowing such holder or holders to foreclose or otherwise realize upon such liens; (xi) any motion or application is filed by or on behalf of the Debtor in the Chapter 11 Case seeking the entry of an order, or an order is entered in the Chapter 11 Case, approving any subsequent debtor in possession facility for borrowed money or other extensions of credit unless such subsequent facility and such order expressly provide for the indefeasible payment and complete satisfaction in full in cash to the Agent and Lenders of all Indebtedness prior to, or concurrently with, any initial borrowings or other extensions of credit under such subsequent facility; (xii) any disclosure statement or Chapter 11 plan is filed by or on behalf of the Debtor in the Chapter 11 Case without the prior written consent of the Agent (which consent may be withheld in its sole discretion); or (xiii) the effective date of any confirmed Chapter 11 plan in the Chapter 11 Case.  (Interim Order ¶ 14).

M.     White Oak shall release any and all claims to or interests in the certificate of deposit that secures the Debtor's obligations under that certain Irrevocable, Transferable, Standby Letter of Credit (Letter of Credit No. 101024272) issued by Plains Commerce Bank to the South Dakota Animal Industry Board, and the Debtor shall be entitled to use the proceeds of such certificate of deposit for the

7

        payment of priority tax claims to the extent authorized by the Court or under the applicable provisions of the Bankruptcy Code. (Interim Order ¶ 3).

N.     Except as otherwise provided in the DIP Agreement or as otherwise agreed to by White Oak, all funds advanced pursuant to the DIP Agreement shall be used solely as provided in the budget attached hereto as Exhibit C. (Interim Order ¶ 3, 16).

O.     Upon the Termination Date, White Oak shall be entitled to exercise its rights and remedies without further application to the Court. (Interim Order ¶ 12(b)).

P.     Subject to the entry of the Final Order, no costs or expenses of administration or other charge, lien, assessment or claim incurred at any time (including any expenses set forth in any Approved Budget or any other budget) by any person or entity shall be imposed against the Agent or Lenders, their claims, or their Collateral under § 506(c) of the Bankruptcy Code or otherwise, unless, prior to incurring such costs or expenses (i) the party proposing to incur such cost or expense shall obtain the written consent of the Agent (which consent may be withheld in its sole discretion) allowing such charge to be imposed against the Agent and Lenders, their claims or their Collateral under § 506(c) of the Bankruptcy Code, or (ii) this Court enters an order allowing such charge to be imposed against the Agent and Lenders, their claims or their Collateral under § 506(c) of the Bankruptcy Code. (Interim Order ¶ 13).

Q.     As adequate protection for, and in an aggregate amount equal to, the diminution in value of the interests of the Agent and the Lenders in the Pre-Petition Collateral (including Cash Collateral) from and after the Petition Date, the Agent and the Lenders shall receive: (a) Replacement Liens upon all of the DIP Collateral, which Replacement Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prior Claims, and the payment of the Carve Out and shall rank in the same relative priority and right as the pre-petition liens of the Agent and the Lenders do with respect to the Pre-Petition Collateral, in each case, to the extent expressly provided in the DIP Loan Documents and the Interim Order; (b) allowed super-priority administrative claims pursuant to section 507(b) of the Bankruptcy Code, junior only to the priority of the DIP Indebtedness and the Carve Out to the extent provided in the Interim Order and in the DIP Loan Documents and payable from and having recourse to all of the DIP Collateral; and (c) reimbursement for any and all of its accrued and past-due fees, costs, expenses and charges to the extent payable under the Pre-Petition Loan Documents, payment-in-kind interest on the Pre-Petition Indebtedness, calculated at the Default Rate, in accordance with the Pre-Petition Credit Agreement, and all reasonable and documented fees, costs and expenses of one primary counsel, one local counsel, and one financial advisor for the Agent. (Interim Order ¶ 10).

R.     The establishment of milestones for the Debtor to achieve a sale of substantially all of its assets as follows: (a) by August 2, 2013, the Court shall have entered an order authorizing the Debtor to retain Lincoln Partners Advisors LLC, on terms

and conditions acceptable to the Agent in its sole discretion, to market substantially all of the assets of the Debtor for sale (the "Asset Sale"); (b) by August 15, 2013, the Debtor shall have entered into a binding agreement for an Asset Sale transaction, on terms and conditions acceptable to the Agent in its sole discretion, subject to higher and better offers (the "Stalking Horse Bid") and filed a motion with the Court, acceptable in form and substance to the Agent in its sole discretion, seeking approval of bid and sale procedures and seeking approval of the Stalking Horse Bid, subject to higher and better offers; (c) by August 29, 2013, the Court shall have entered an order, in form and substance acceptable to the Agent in its sole discretion, approving bid and sale procedures, the stalking horse bid (subject to higher and better offers) and scheduling an auction date and final sale hearing in accordance herewith; (d) by October 1, 2013, the Debtor and its advisors shall conduct an auction of substantially all of the Debtor's assets; (e) by October 2, 2013, the Court shall have entered an order, in form and substance acceptable to the Agent in its sole discretion, approving the Asset Sale; (f) by October 17, 2013, the Debtor will close the Asset Sale and deliver sufficient net proceeds of such sale to the Agent to repay all outstanding Indebtedness in full in cash; (g) the Debtor and its advisors shall provide the Agent with at telephonic reports of all sale efforts, expressions of interest and offers received, to occur at least weekly and more frequently upon the Agent's reasonable request; (h) the Debtor shall keep the Agent informed on a current basis of the status of all written proposals for purchase of the Debtor's assets received and provide the Agent with copies of all such proposals and other related communications received from third parties within one (1) business day after the Debtor's receipt thereof. (Interim Order ¶ 17).

### 3. Pre-Petition Secured Debt

#### A. White Oak

21.     The Debtor and White Oak are parties to that certain Loan and Security Agreement dated September 10, 2012 (as amended from time to time, the "2012 White Oak Loan Agreement"), pursuant to which White Oak provided financing in the aggregate principal amount of $35,000,000.00. As of the Petition Date, the outstanding balance owing under the 2012 White Oak Loan Agreement (inclusive of principal, capitalized interest, Make Whole Amount and other yield maintenance amounts) was not less than $64,417,350.64, plus accrued and unpaid pre-petition and post-petition interest, fees, expenses and other amounts chargeable under the 2012 White Oak Loan Agreement.

22. Pursuant to the 2012 White Oak Loan Agreement and that certain One Hundred Eighty Day Redemption Mortgage and Security Agreement with Assignment of Rents and Fixture Filing dated September 10, 2012 (the "White Oak Mortgage"), as security for performance of the Debtor's obligations under the 2012 White Oak Loan Agreement, the Debtor granted White Oak a security interest in substantially all of the Debtor's assets, including all accounts, chattel paper, collateral accounts, commercial tort claims, documents, equipment, general intangibles, goods, instruments, inventory, investment property, letter-of-credit rights, books and records, fee title interests in real property, and all proceeds of any of the foregoing (collectively, the "Pre-Petition Collateral").

23. In order to perfect White Oak's security interest in certain deposit accounts, White Oak, the Debtor, and Plains Commerce Bank entered into two (2) Deposit Account Control Agreements dated September 10, 2012, which specified the conditions under and terms by which White Oak was granted control over five (5) accounts.

24. In addition, White Oak perfected its interests in the Collateral by the following filings:

   A. UCC-1 financing statement, filed with the South Dakota Secretary of State on November 26, 2012 (Filing No. 20123311610007);

   B. UCC-1 financing statement, filed with the South Dakota Secretary of State on September 7, 2012 (Filing No. 20122511110035);

   C. UCC-1 financing statement, filed with the South Dakota Secretary of State on September 7, 2012 (Filing No. 20122511110034); and

   D. White Oak Mortgage, filed with the Register of Deeds for Brown County, South Dakota on September 26, 2012 (Instrument No. 2011206781 (Book: 656 Mortgage, Page: 947).

   **B. SDIF Limited Partnership 6, SDIF Limited Partnership 9**

25. The Debtor is indebted to SDIF Limited Partnership 6 ("SDIF 6") pursuant to that certain Amended Credit Agreement dated March 4, 2011 (the "SDIF Credit Agreement").

26. Pursuant to that certain Agreement dated August 30, 2011, between SDIF 6 and SDIF Limited Partnership 9 ("SDIF LP 9"), SDIF LP 6 granted to SDIF LP 9 a participation under the SDIF Credit Agreement of up to $25,000,000.

27. As of the Petition Date, the outstanding balance owing under the SDIF Credit Agreement, including principal and accrued interest, was approximately $59,000,000.00.

28. The Debtor's obligations under the SDIF 6 Credit Agreement were originally secured by a security interest in substantially all of the Debtor's personal property pursuant to that certain Security Agreement dated November 4, 2010. A UCC-1 financing statement related SDIF's security interest was filed with the South Dakota Secretary of State on November 16, 2010 (Filing No. 20103201370082). SDIF 9's security interest was perfected by the filing of a UCC-1 financing statement with the South Dakota Secretary of State on July 9, 2012 (Filing No. 20121911670090).

29. On November 26, 2012, a UCC-3 amendment was filed (Filing No. 20103201370082), by which the description of the collateral securing the debt owing to SDIF 6 was amended to delete "accounts receivable and inventory, and all proceeds thereof."

30. The Debtor's obligations under the SDIF 6 Credit Agreement are further secured by the following:

    E. Collateral Real Estate Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated March 18, 2010, by which the Debtor granted an interest in its real estate to Epoch Star Limited to secure payment of a loan in the amount of $30,000,000.00, recorded with the Register of Deeds for Brown County, South Dakota on April 13, 2010.

    F. Corrective and Confirmatory Mortgage – Collateral Real Estate Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated

           July 9, 2010, recorded with the Register of Deeds for Brown County, South Dakota on July 30, 2010.

G.     Assignment of the Epoch Mortgage dated November 4, 2010 executed by the Debtor, and recorded with the Register of Deeds for Brown County, South Dakota on December 6, 2010.

H.     Assignment of the Epoch Mortgage dated December 6, 2010 executed by Epoch, and recorded with the Register of Deeds for Brown County, South Dakota on December 10, 2010.

I.     Mortgage in favor of SDIF 6 dated November 5, 2010, recorded with the Register of Deeds for Brown County, South Dakota on December 6, 2010.

J.     Mortgage in favor of SDIF 9, recorded with the Register of Deeds for Brown County, South Dakota on July 5, 2012.

31.     Pursuant to that certain Subordination Agreement dated September 10, 2012 (the "SDIF 6 Subordination Agreement"), SDIF 6 agreed to subordinate all indebtedness of the Debtor to SDIF 6 to up to $40,000,000.00 in indebtedness of the Debtor owing to White Oak, and to subordinate all liens, mortgages, and security interests securing the SDIF 6 indebtedness to those securing the White Oak indebtedness.

32.     Pursuant to the SDIF 6 Subordination Agreement, a Memorandum of Subordination Agreement dated September 10, 2012 was recorded with the Register of Deeds for Brown County, South Dakota on September 26, 2012.

33.     The SDIF 6 Subordination Agreement was amended on November 16, 2012 to increase the amount of the senior indebtedness to $45,000,000.

34.     Pursuant to that certain Subordination Agreement dated September 10, 2012 (the "SDIF 9 Subordination Agreement"), SDIF 9 agreed to subordinate all indebtedness of the Debtor to SDIF 9 to up to $40,000,000.00 in indebtedness of the Debtor owing to White Oak, and to subordinate all liens, mortgages, and security interests securing the SDIF 9 indebtedness to those securing the White Oak indebtedness.

35. Pursuant to the SDIF 9 Subordination Agreement, a Memorandum of Subordination Agreement dated September 10, 2012 was recorded with the Register of Deeds for Brown County, South Dakota on September 26, 2012 (Instrument No. 2011206782 (Book: 656 Mortgage, Page: 948).

36. The SDIF 9 Subordination Agreement was amended on November 16, 2012 to increase the amount of the senior indebtedness to $45,000,000.

### D. Wells Fargo Factoring Agreement

37. The Debtor and Wells Fargo Bank, National Association ("Wells Fargo") are parties to that certain Account Purchase Agreement dated January 2, 2013, pursuant to which Wells Fargo agreed to purchase, and the Debtor agreed to sell, certain accounts receivable. The sale of the accounts was with recourse, and the Debtor would be liable for various obligations to the extent that Wells Fargo were unable to collect from an account debtor.

38. To secure performance of its obligations under the Account Purchase Agreement, the Debtor granted Wells Fargo a security interest in the Debtor's accounts, and various interests and rights associated with its accounts.

39. Wells Fargo filed a UCC-1 financing statement with the South Dakota Secretary of State on December 20, 2012 (Filing No. 20123551310033).

40. Pursuant to an Intercreditor Agreement dated January 2, 2013, White Oak agreed to subordinate its security interest in the Wells Fargo collateral.

41. By reason of the foregoing, Wells Fargo has a first priority security interest in those assets to which its security interest attached and was perfected. As of the Petition Date, the Debtor had not sold any accounts to Wells Fargo, and had no other obligations to Wells Fargo.

### E.  PASA Trust Rights

42. As noted above, the Debtor's cattle purchases are subject to PASA.  Under PASA, a packer such as the Debtor holds all livestock purchased in cash sales, and all inventories of, or receivables or proceeds from meat, meat food products, or livestock products derived therefrom, in trust for the benefit of all unpaid cash sellers of such livestock.

43. As of the Petition Date, the Debtor had no unpaid obligations to sellers with enforceable trust rights under PASA.

### F.  Other Secured Debt

44. In addition to the above-described liens and security interests, public records indicate that the Debtor's assets may be subject to the security interests described in the attached Exhibit D.

45. To the extent that the interests described in Exhibit D are valid, enforceable interests, and are not subject to avoidance, they shall be senior to the DIP Liens, and shall be "Permitted Senior Security Interests" for purposes of the DIP Loan Agreement.  The relief sought in this motion is without prejudice to the Debtor's rights with respect to the Permitted Senior Security Interests, and nothing herein shall be deemed a waiver of any such right.

46. Other than the security interests and liens referenced in this motion, the Debtor is unaware of any party who has asserted or may assert any lien on or security interest in any of the Debtor's property.

### 4.  Adequate Protection of Other Creditors' Interests

47. The relief sought in this motion will have no effect on the priority or effect of any creditors' liens or security interests, except for those of SDIF 6 and SDIF 9, which would be junior to the security interest granted to White Oak

48.     But for the financing to be provided by White Oak, the Debtor would be unable to maintain its property or administer this case and its assets. Without post-petition financing, this bankruptcy case would either have to be dismissed or converted. The proceeds of liquidation under either scenario would be substantially less than the sum of: (i) what will be realized through the sale process in chapter 11; plus (ii) the additional indebtedness to be incurred under the DIP Agreement. As such, the junior creditors' interests would be adequately protected.

### PROPOSED NOTICE AND NO PRIOR REQUEST

49.     The Debtor proposes that, upon entry of an order scheduling a preliminary hearing, notice of this motion be served by ECF notice or first class U.S. Mail on: (i) the United States Trustee; (ii) Daewoo International (America) Corp.; (iii) SDIF Limited Partnership 6; (iv) SDIF Limited Partnership 9; (v) White Oak GLobal Advisors, LLC; (vi) Wells Fargo Bank, National Association; (vii) the creditors identified in Exhibit D; (viii) South Dakota Animal Industry Board; and (ix) the creditors holding the ten largest unsecured claims as of the Petition Date, according to the Debtor's books and records.

50.     No prior request for the relief sought in this motion has been made to this Court or any other court.

**WHEREFORE,** the Debtor requests that the Court: (i) enter the Interim Order approving the DIP Agreement on an interim basis and authorizing the Debtor to obtain secured credit of in an amount not to exceed $600,000.00 during the period ending August 17, 2013; (ii) enter an order approving the DIP Agreement on a final basis and authorizing the Debtor to obtain secured credit of in an amount not to exceed $4,900,000.00, including the amount funded prior to entry of the final order; and (iii) grant such further relief as the Court deems just and proper.

| | |
|---|---|
| Date: July 24, 2013 | **COZEN O'CONNOR**<br><br>By:/s/ <u>Steven H. Silton</u><br>　　Steven H. Silton (Minn. #260769)<br>　　Thomas G. Wallrich (Minn. # 213354)<br>　　Joel D. Nesset (Minn. #030475X)<br>　　33 South Sixth Street, Suite 4150<br>　　Minneapolis, MN 55402<br><br>**BANTZ, GOSCH & CREMER, L.L.C.**<br><br>　　Rory King (S.D. #947)<br>　　305 Sixth Ave. SE<br>　　Aberdeen, SD 57402-0970<br>　　Phone: (605) 225-2232<br><br>*Attorneys for Northern Beef Packers Limited Partnership* |

## VERIFICATION

I, Karl Wagner, Chief Financial Officer of Northern Beef Packers Limited Partnership, hereby declare under penalty of perjury that the facts alleged in the foregoing motion are true and correct to the best of my knowledge, information, and belief.

Date:  July 24, 2013

_____
Karl Wagner