UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Bankr. No. 13-10118 |
| | ) | Chapter 11 |
| Northern Beef Packers Limited Partnership | ) | Hon. Charles L. Nail, Jr. |
| SSN/ITIN 26-2530200 | ) | |
| | ) | Hearing Date:  August 8, 2013 |
| Debtor. | ) | Hearing Time: 9:00 a.m. |
| | ) | |

**MEMORANDUM OF WHITE OAK GLOBAL ADVISORS, LLC, AS AGENT, IN SUPPORT OF (I) DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING (A) SECURED POST-PETITION FINANCING ON A SUPER PRIORITY BASIS PURSUANT TO 11 U.S.C. § 364, (B) USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363 AND (C) GRANT OF ADEQUATE PROTECTION PURSUANT TO 11 U.S.C. §§ 361, 363 AND 364, AND REQUEST FOR PRELIMINARY HEARING, AND (II) DEBTOR'S APPLICATION TO EMPLOY LINCOLN PARTNERS ADVISORS LLC AS FINANCIAL ADVISOR**

White Oak Global Advisors, LLC ("White Oak"), in its capacity as agent ("Agent") and on behalf of the other lenders ("Lenders") hereby submits this Memorandum in Support of (I) Debtor's Motion for Interim and Final Orders Authorizing (A) Secured Post-Petition Financing on a Super Priority Basis Pursuant to 11 U.S.C. § 364, (B) Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and (C) Grant of Adequate Protection Pursuant to 11 U.S.C. §§ 361, 363 and 364, and Request for Preliminary Hearing (the "Motion") [Docket No. 45], and (II) Debtor's Application to Employ Lincoln Partners Advisors LLC ("Lincoln") as Financial Advisor (the "Lincoln Application") [Docket No. 41], and respectfully states as follows:

**PRELIMINARY STATEMENT AND BACKGROUND**

The Debtor is not operating and has no cash.  The Debtor's primary asset, the Aberdeen beef processing facility, currently sits idle and is in dire need of funding to pay critical post-petition expenses necessary to preserve value, including to (1) pay security guards to protect the plant and its contents, including valuable M&E, (2) pay a skeleton staff of essential employees to handle administrative needs of the Debtor and assist with the Debtor's bankruptcy case and

preservation and sale of the facility, (3) address and avert potential environmental and M&E maintenance and preservation issues and concerns that, if not addressed, could reduce the value of assets and add more costs and delays to getting the facility sold or operational, (4) adequately insure the facility, (5) pay utilities to keep power and other key services available, and (6) pay other necessary expenses, including costs and expenses of Debtor's counsel and other advisors incurred in these proceedings. The Debtor does not have any funds on hand to pay any of these crucial expenses.

White Oak and the Lenders are the Debtor's pre-petition secured lenders and have perfected senior liens on substantially all of the assets of the Debtor. White Oak and the Lenders have agreed to extend post-petition secured financing to the Debtors in the form of a term loan, subject to the terms of the proposed order and budget (the "Budget") attached to the Motion, to fund those expenses identified above so that the Debtors may embark on a Court-approved and expedited § 363 sale process over the next ninety (90) days. The Debtor has labored extensively over the last three months to put together a sale process that will be the product of a thorough and comprehensive marketing efforts guided by Lincoln, and structured to produce an opening, or stalking horse, bidder and generate a subsequent robust bidding process designed to produce the highest and best bid. The White Oak post-petition financing will fund all aspects of this sale process pursuant to the Budget.

The hallmark of the proposed sale process is that it will result in the quickest, cheapest and most efficient process to get the plant running in the hands of a new operator that will likely (a) have the necessary capital to put the plant on solid financial footing so that it becomes a long-term economic and employment prospect for the Aberdeen community and South Dakota's cattle

industry, and (b) have the necessary expertise to operate and manage the plant competitively over the long-run.

White Oak fully understands and embraces that every step of this contemplated sale process will be supervised by, and require the approval of, the Court. White Oak further submits this process has far greater potential to do good and produce value to the Aberdeen community and local economy than other options such as a Chapter 7 liquidation or state law receivership and foreclosure proceeding. Both of those latter alternatives carry more elements of unpredictability and delay and have the potential to chill current potential buyers being pursued by Lincoln. Worse, these other options will likely result in greater costs and expenses to all stakeholders, potentially generate less realizable value and place a further drain on the local economy due to the lengthier period the plant would remain dark.

In light of the Court's comments of July 31 to the Motion and proposed interim financing order submitted therewith (the "Order"), White Oak seeks to respond to the Court's comments, to clarify the terms of the post-petition financing and the Order, and to further advise the Court of certain modifications to the proposed Order to address the Court's concerns. White Oak respectfully submits that the proposed post-petition financing provides the Debtor and its estate with the best chance to "hit the ground running" in its efforts to maximize the value of the facility and achieve an expeditious sale and to preserve the value of the Debtor's assets during that sale process.

### THE COURT'S SPECIFIC QUESTIONS AND CONCERNS

We have identified fourteen (14) specific questions, concerns and comments that the Court stated on the record during the July 31 hearing. We separately address each item below:

1.      **Motion ¶ 20(R) - § 363 Sale Process and Related Milestones (Order ¶ 17)**

The Court expressed concerns regarding its desire to oversee and control the proposed § 363 asset sale process and the retention of Lincoln to manage the same, and raised further questions regarding whether a chapter 7 trustee could sell the assets in a chapter 7 proceeding for significantly less than the section 363 sale in chapter 11 contemplated in the proposed Order.

With respect to the section 363 process envisioned here, we advise the Court that it is the product of extensive prepetition efforts by the Debtor and Lincoln. Specifically, three months ago in May 2013, the Debtor retained Lincoln and during that time they have thoroughly pursued a variety of restructuring and refinancing alternatives. The Debtor and Lincoln have determined that the only realistic option to maximize the value of the Debtor's assets for the benefit of all stakeholders under the circumstances is for the Debtor to pursue a section 363 asset sale pursuant to a 90-day sale timeline recommended by Lincoln based on the interest in the Debtor's assets. White Oak supports this plan and has agreed to fund all costs of the sale process contemplated herein, either out of its own pocket as part of the post-petition financing pursuant to the Budget or from a carve out from White Oak's collateral as set forth in the Order.

Lincoln has identified and corresponded with approximately 150 potential financial and strategic purchasers and it continues to work with interested parties in order to secure a stalking horse bidder and ensure a robust, competitive auction. By any measure, the Debtor's decision and efforts to seek this sale process are based upon a sound business justification to effect a prompt sale and return its assets to productive use in the hands of a new operator. This is precisely the purpose of section 363 of the Bankruptcy Code.

Asset sales under section 363 of the Bankruptcy Code prior to the filing or confirmation of a chapter 11 plan are appropriate and have become an appropriate and accepted means of

4

liquidating a debtor's assets under the Bankruptcy Code.  *See* Douglas G. Baird, Lessons From the Automobile Reorganizations, 4 J. LEGAL ANALYSIS 271, 272 (2012) ("The debate over speedy sales of all the assets of the business as a going concern is over.  Sales are the norm . . . [t]he debate now centers on how the sales should be conducted.") (citation omitted); Ralph Brubaker & Charles Jordan Tabb, *Bankruptcy Reorganizations and the Troubling Legacy of Chrysler and GM*, 2010 U. ILL. L. REV. 1375, 1378 (2010) ("The basic 'sales are suspect' concern, we submit, is largely yesterday's news and can and should be readily disposed of . . . there is nothing about capturing reorganization value via a § 363 sale rather than through a plan that is in itself problematic. Indeed, the reality of chapter 11 practice has long since moved to the sale norm, and we do not advocate a retreat."); see also 3 COLLIER ON BANKRUPTCY ¶ 363.02[3] (15th ed. rev. 2009) (providing it is "now generally accepted" that section 363 allows sales of all assists in chapter 11); *In re Exaeris, Inc*., 380 B.R. 741, 744 (Bankr. D. Del. 2008) (providing that a 363 sale of all assets outside a plan of reorganization is "not unusual or inappropriate").

Indeed, courts have consistently approved prompt sales outside of a plan when, like the circumstances here, it is necessary to preserve and maximize the Debtor's value.  *See, e.g*., *In re CPJFK, LLC*, No. 10–50566, 2011 WL 1257208, at *11-13 (Bankr. E.D.N.Y. 2011) (approving sale because debtor had no financing alternatives); *In re Cummins Utility, L.P*., 279 B.R. 195, 198 (Bankr. N.D. Tex. 2002) (case filed Oct. 16 because of deteriorating business; sale procedures approved Oct. 25; auction Nov. 9; sale approved Nov. 28); *In re Thomson McKinnon Sec., Inc*., 120 B.R. 301, 308-09 (Bankr. S.D.N.Y. 1990) (determining that, with "no other prospective purchaser in sight," it was appropriate to approve the sale on the terms presented rather than "comprise the debtor's only remaining substantial asset"); *In re WBQ Partnership*, 189 B.R. 97, 103 (Bankr. E.D. Va. 1995) (approving sale where debtor unable to reorganize and

5

preconfirmation sale would benefit creditors by relieving debtor's estate of accruing interest, property taxes and insurance escrows); *In re Rausch Mfg. Co.*, 59 B.R. 501, 503 (Bankr. D. Minn. 1985) (approving sale because the buyer intended to maintain the debtor as a business entity that employed people in the community); *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 420 (Bankr. S.D. Tex. 2009) (stating that the typical sale under § 363 is completed in less than ninety days).

The fact that the Debtor here is not currently operating should not preclude the Debtor from conducting a section 363 sale outside of a chapter 11 plan. In a recent case under circumstances similar to those here, a debtor poultry producer that had ceased operations obtained bankruptcy court approval to dispose of substantially all of its real and personal property and equipment in a section 363 sale in order to maximize the value of such assets and to reduce the expenses of carrying the assets and administrative expenses. *See* Order Under 11 U.S.C. Sections 105(A) and 363 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 Authorizing and Approving the Sale of Substantially all of the North Carolina Assets of Omtron USA, LLC, a Delaware Limited Liability Company, Free and Clear of all Liens, Claims and Encumbrances at 6, *In re Omtron USA, LLC*, No. 12-81931 (Bankr. M.D.N.C. July 17, 2013), ECF No. 563. Additionally, in *In re Qualteq, Inc.*, the court approved two separate § 363 sales. In the first sale, the debtors sold all the assets of their operating companies. In the second § 363 sale, debtors auctioned off the remaining, non-operating real property assets after they were subject to a competitive bidding process designed garner the highest or best value for the real property.[1]

---

[1] *See* Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of all of the Selling Debtors' Real Property, (b) Approving the Form and Manner of Notice , (C) Scheduling an Auction and a Sale Hearing, (D) Approving Procedures for the Selection of Stalking Horse Bidders, (E) Approving Procedures for the Assumption and Assignment of Contracts, and (E) (sic) Granting Related Relief at 3, 25, *In re Qualteq, Inc., d/b/a VCT New Jersey, Inc., et al.*, Case No. 12-05861, (Bankr. N.D. Ill. Jan. 16, 2013), ECF No. 563.

While a full discussion of the justification for the Debtor's asset sale under section 363 is not currently before the Court, substantially all of the Debtor's stakeholders, along with the Debtor's professionals, have determined that such a sale is required to maximize the value of the Debtor's assets, and the proposed sale process is a condition to the post-petition financing offered by White Oak. Consequently, approval of the Motion and Lincoln Application with the contemplated sale milestones is warranted.

White Oak wishes to stress that every significant and pertinent sale milestone set forth in the proposed Order, as well as the retention of Lincoln set forth in the Lincoln Application, was always intended to be, and remains, subject to Court review and approval. The Debtor must first exercise its business judgment in deciding to bring those motions to the Court. We submit that it is further both commonplace and reasonable for White Oak as the senior secured pre-petition lender and proposed post-petition secured lender to have the ability to consent to the Debtor filing such motions to sell White Oak's collateral. Even after those motions are filed, the sale of the Debtor's assets cannot be completed without Court authorization and the proposed Order recognizes that the Court is the ultimate decision maker that controls any process of which the Debtor seeks approval.

With regard to the relative expenses of the contemplated chapter 11 liquidation versus a chapter 7 liquidation, counsel for the Debtor has advised us, and we agree, that it appears very doubtful that there would be significant savings in a chapter 7. First, the statutory trustee fees on the sale proceeds would likely equal or exceed Debtor's and any statutory committee counsel's fees and expenses. Second, the contemplated consensual chapter 11 section 363 sale process will be quicker and more efficient, and most likely result in a sale at a higher price, than a chapter 7

7

liquidation that would involve the risk of lengthy delay and other uncertainties with a newly involved chapter 7 trustee.

Finally, we respectfully submit that the Court should give appropriate deference to the Debtor's business judgment in seeking in the Motion to implement this sale process now as well as the anticipated testimony from Lincoln as to what it has already done to foster this process over the last three months and why this process will achieve the best result and ultimately get this plant sold and in the hands of a new operator as soon as possible.

2. **Motion ¶ 20(A) - Amount of Post-Petition Loan Advanced to Debtor (Order ¶ 3)**

The Court indicated it would only authorize the Debtor to incur post-petition financing up to, but not beyond, the budgeted need of approximately $1.5 million through October 2013. The proposed post-petition facility contemplates White Oak advancing a $2.45 million term loan during the applicable period.

White Oak advises the Court that the Debtor, in its business judgment, has requested some cushion in the Budget and that White Oak's *post-petition* reimbursable fees and expenses permitted as part of the post-petition financing are not included in the Budget. Further, White Oak is prepared to submit evidence to the Court that White Oak does not operate as a traditional revolving lender (*i.e.*, White Oak has to make a capital call from partners/investors to get cash, and White Oak does not customarily engage in the type of daily advances and collection activity that a revolving lender would do) and, as a result, the proposed post-petition loan is structured as a term loan, the proceeds of which are advanced up front. It is extremely difficult and impracticable for White Oak to keep going back to investors to fund any additional cash needs of the Debtor due to difficulties with timing, unforeseen expenses, and from a functional and operational standpoint, White Oak simply cannot fund budgeted items and unplanned excesses

the way a traditional revolving lender can. Thus, the $2.45 million amount was calculated to address these issues.

### 3. Motion ¶ 20(B) - Post-Petition Financing Fee (Order ¶ 5, last sentence)

The Court questioned the reasonableness of the $62,500 post-petition financing fee (which was calculated as approximately 2.5% of the $2.45 million cash component of the proposed post-petition loan) and requested evidence to address the Court's concerns. At this time, White Oak will agree to limit the post-petition financing fee to 1.0% of the *cash portion* of the post-petition facility that the Court approves per Point 2 above.[2] Should the Court approve the proposed $2.45 million post-petition term loan, the financing fee will be reduced to $24,500. White Oak submits that such fee, as modified, is reasonable under the circumstances and is prepared to present a witness to testify to the same should the Court request.

### 4. Motion ¶ 20(C) - Reasonableness of Interest Rate (Order ¶ 5)

The Court has questioned the reasonableness of the 16% interest rate on the post-petition financing. White Oak is prepared to submit evidence at the continued hearing demonstrating (1) that the interest rate on the post-petition loan is the same as the cash component of the non-default interest rate applicable to the pre-petition loan (which also included an additional 2% of PIK interest), (2) that the Debtor is unable to access debt financing from traditional bank lenders or similar channels that advance credit at lower or LIBOR-based rates, and (3) that the market commands this rate given the level of risk involved and it is typical and commercially reasonable for deals with the Debtor's risk profile to command such rates.

Without conceding or waiving any of the foregoing issues, White Oak is prepared to agree to reduce the interest rate charged on the post-petition loan to 9% which will be reflected

---

[2]   *See also* Point 8 below. White Oak is no longer seeking the roll up as part of the proposed post-petition facility.

in the revised proposed Order.  Additionally, we note that other courts have approved post-petition financing at or above this reduced rate.[3]

### 5. ¶ 20(D) of Motion - Payment of Interest and Fees on Pre-Petition Debt

The Court expressed two concerns here.  First, the Court questioned whether there will be any evidence presented demonstrating that White Oak is over-secured in this case.  Second, to the extent White Oak is over-secured and entitled, under § 506(b), to payment of its fees and expenses reimbursable under the prepetition loan documents during the post-petition period, the Court was unsure whether the proposed Order took away the Court's rights to approve such fees.

White Oak does not intend to present evidence at the hearing regarding whether it is over-secured; indeed, it is currently unknown what the potential sale price of the Debtor's assets will be.  To address the Court's concerns, however, White Oak will agree to (1) not currently accrue or pay any interest or fees on the pre-petition debt after the petition date, (2) defer any determination as to whether White Oak is over- or under-secured until a later time, and (3) reserve and preserve all of White Oak's rights to seek payment of such fees and interest if White Oak is either over-secured or as part of White Oak's rights to seek and obtain adequate protection.  The revised proposed Order will reflect these changes.

Finally, to the extent White Oak is over-secured, White Oak will further agree to amend the proposed Order so that, in the event that White Oak is ultimately determined to be over-secured, White Oak complies with the Court's procedure for submission and approval of such fees under § 506(b).

---

[3] *See In re Fifty Below Sales & Marketing, Inc*., No. 12-50900, ECF No. 66 (Bankr. D. Minn. Nov. 1, 2012) (approving post-petition loan at 14% interest rate); *In re Otologics, L.L.C*., No. 12-4705, ECF. No. 31 (Bankr. E.D. Mo. July 26, 2012) (approving interim post-petition loan at 15% interest rate); *In re Tri-Valley Corp*., No. 12-12291, ECF No. 29 (Bankr. D. Del. Aug. 9, 2012) (approving interim post-petition loan at 16%); *In re Powerwave Techs., Inc*., No. 13-10134, ECF No. 415 (Bankr. D. Del. April 23, 2013) (approving final post-petition loan at 16% interest rate).

6. **¶ 20(E) of Motion - Superpriority Administrative Claim Status of Post-Petition Loan (Order ¶¶ 13,18)**

The Court stated that §364(c)(1) super-priority administrative claim relief should only be required if the collateral proves to be insufficient. The process envisioned here and in the proposed Order at ¶ 18 is that the net sale proceeds from the sale of the Debtor's facility will be distributed to pay off any prior senior liens, the White Oak pre-petition secured indebtedness, and then the secured post-petition loan. If the collateral is insufficient to satisfy the post-petition loan, then the super-priority administrative claim relief is available to satisfy the post-petition loan. We believe the application of proceeds language in the proposed Order adequately addresses this concern and contemplates the superpriority administrative relief coming into play, if necessary, after the application of the net sale proceeds of the collateral.

7. **Motion - ¶ 20(G) - Post-Petition Lien Is Subject to Existing Prior Claims (Order ¶ 7)**

The Court stated that any senior first priority post-petition lien granted to secure the post-petition loan must be subject to all prior liens, not just "Permitted Liens" listed on the Debtor's Exhibit D to the Motion.

Paragraph 7 of the proposed Order states that the proposed post-petition liens would be subject to "Prior Claims" which are defined to specifically include White Oak's prepetition liens and any other non-avoidable, valid, enforceable and perfected liens and security interests in favor of any person or entity on or in any assets of the Debtor which existed on the Petition Date, but only to the extent such liens are superior to White Oak's prepetition liens, after giving effect to any subordination agreements. We submit that this language (which is more broad than the limited list of "Permitted Liens" listed on Exhibit D to the Motion) addresses the Court's concerns under these circumstances.

11

8.     **Motion Paragraph 20(H) - Roll-up (Order ¶ 7)**

The Court expressed concerns with the roll-up provision of the proposed post-petition financing. White Oak will agree to drop this provision from the post-petition financing and proposed Order.

9.     **Motion Paragraph 20(K) - Waiver of Claims (Order ¶¶ 25, 27)**

The Court stated that it was not prepared to make any waiver consented to by the Debtor binding on other parties in interest.

The proposed post-petition facility was not designed to instantaneously bind parties other than the Debtor. Paragraphs 25 and 27 of the proposed Order provide for a 30-day objection deadline running from July 19 for any party-in-interest other than the Debtor to object to (1) the types of claims against White Oak being released and (2) the validity, extent, priority, avoidability, or enforceability of White Oak's pre-petition debt or security interests in the collateral. Thus, the proposed Order does preserve the rights of parties other than the Debtor to challenge White Oak's claims and liens for a limited period of time. It is uncommon for a post-petition lender, such as White Oak here, to accept and fund a post-petition loan with an open-ended period for any party to challenge the post-petition lender's prepetition claims or liens. In our experience, there should be a final date at which time the Debtor's stipulation does become binding on other parties in interest. White Oak suggests a reasonable alternative here to address the Court's concern is to lengthen the time for such parties to object by 30 days, to September 17, 2013, since the existing 30 day deadline initially contemplated by the proposed Order is set to expire soon on August 18, 2013 and the Order has not yet been entered.

10. **Motion ¶ 20(L) - Termination of Post-Petition Financing (Order ¶ 6)**

The Court requested clarification of the language in the proposed Order regarding whether the termination of the post-petition financing was triggered by the entry of a final financing order or a final order approving the sale of the plant.

White Oak submits that the proposed Order is intended to set forth a fairly standard termination provision and is designed so that the *interim financing order* automatically terminates upon the entry of a *final financing order* (which supplants the interim order). In addition to this concept, paragraph 6 of the proposed Order sets forth a list of other items that trigger a termination of the post-petition financing regardless of whether the interim or final financing order is then in effect. In Point 12 below, we will explain what White Oak's rights are in the event of an occurrence of one or more of the termination events specified in paragraph 6 of the proposed Order.

11. **Motion ¶20(M) - Use of L/C Collateralization Proceeds (Order ¶ 3)**

The Court expressed concerns over the use of certificate of deposit collateralizing the L/C to pay pre-petition payroll tax obligations. In discussions with counsel for the Debtor, we understand this proposed use of funds will be removed from the proposed Order and, as a result, is no longer an issue before the Court at this time.

12. **Motion ¶ 20(O) - White Oak's Rights Upon Termination of Order (Order ¶12(b))**

The Court expressed concerns that under the proposed Order, White Oak would be permitted to exercise its rights and remedies without further application to the Court in the event of an occurrence of a termination event listed in ¶ 6 of the Order.

Paragraph 12(b) of the proposed Order requires White Oak to give three (3) days notice of the termination to the Debtor, the U.S. Trustee and any official committee appointed in the

case before the stay automatically lifts and White Oak is able to exercise its common law and contractual remedies (such as foreclosure). This notice provision is specifically included so that any objecting party may have a chance to appear before the Court and object or request other relief in the event of an occurrence of a termination event. In our experience, this provision, when it includes this three-day notice period, is an appropriate provision in post-petition financing orders and a compromise between the concerns of the post-petition lender and the estate. We are happy to address any additional questions that the Court may have here.

13. **Motion ¶ 20(P) - 506(c) Waiver (Order ¶ 13)**

The Court requested that the parties provide clarification of the relief sought in this provision. Section 506(c) of the Bankruptcy Code is the highest possible claim that can be awarded in a bankruptcy. It allows the debtor/trustee to surcharge a lender's collateral above all other liens for the costs of preserving and disposing of it. Here, White Oak is funding the post-petition loan out of its own pocket and/or consenting to use its cash collateral to pay such expenses, and is the sole entity funding the sale process. Therefore, there are essentially no other funds and no unencumbered assets available to be used to maintain, preserve or sell the collateral. We believe it is appropriate for post-petition lenders in these circumstances to be granted a 506(c) waiver, since, as here, it would be unfair to subject White Oak to a situation where such expenses are unexpectedly paid by another party (or the Debtor uses White Oak's loan proceeds to pay any unauthorized or unbudgeted "collateral preservation or sale" expenses) without its and the Court's consent. We can provide further clarity on this provision should the Court request at the hearing.

14. **Budgeted Line Items**

In conversations with Debtor's counsel, we understand that evidence will be presented to the Court to show that the budgeted line items the Court identified during the July 31 hearing are necessary post-petition expenses to secure, insure, preserve and sell the collateral in order to maximize value and get the plant in the hands of a new operator as soon as possible.

## CONCLUSION

WHEREFORE, White Oak respectfully requests that the Court grant the Motion and Lincoln Application and enter the proposed Order and an order approving the terms of the Lincoln Application.

Dated: August 7, 2013                               Respectfully submitted,

**WHITE OAK GLOBAL ADVISORS, LLC**

By /s/ Roger W. Damgaard
Roger W. Damgaard
WOODS, FULLER, SHULTZ & SMITH P.C.
300 South Phillips Avenue, Suite 300
Post Office Box 5027
Sioux Falls, South Dakota  57117-5027
Phone:  (605) 336-3890
Facsimile:  (605) 339-3357
Email:  roger.damgaard@woodsfuller.com

Stephen R. Tetro, II (admitted *pro hac vice*)
Mark D. Rasmussen (admitted *pro hac vice*)
CHAPMAN AND CUTLER LLP
111 West Monroe Street
Chicago, Illinois 60603-4080
Phone:  (312) 845-3000
Facsimile:  (312) 845-2361
Email:  stetro@chapman.com
         rasmusse@chapman.com