IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF SOUTH DAKOTA

| | |
|---|---|
| IN THE MATTER OF:<br><br>NORTHERN BEEF PACKERS<br>LIMITED PARTNERSHIP,<br><br>Debtor. | Case No. 13-10118<br><br>Chapter 11 |

**OBJECTION OF THE AD HOC COMMITTEE OF EB-5 INVESTORS TO DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING SECURED POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364(C), AND REQUEST FOR PRELIMINARY HEARING, AND APPROVAL OF STIPULATION REGARDING <u>SECURED POST-PETITION FINANCING</u>**

The Ad Hoc Committee of EB-5 Investors (the "EB-5 Committee") hereby objects to Debtor's "Motion for Interim and Final Orders Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364(c), and Request for Preliminary Hearing, and Approval of Stipulation Regarding Secured Post-Petition Financing" (Doc. No. 321) ("Motion for DIP Financing") and the Stipulation attached to it (the "Stipulation"). In support of this Objection, the EB-5 Committee hereby states as follows:

### BACKGROUND

1.   On September 5, 2013, Debtor filed the Motion for DIP Financing, pursuant to which Debtor seeks Court approval of a Stipulation it has entered into with the Official Committee of Unsecured Creditors ("Creditors Committee") and White Oak Global Advisors, LLC ("White Oak").

2.   Generally speaking, in the Stipulation, White Oak has agreed to provide Debtor with certain post-petition financing on the condition that Debtor sells its assets

4845-9295-8997.1

under 11 U.S.C. § 363 in accordance with the timeline set forth in the Stipulation, which provides a closing date on an asset sale of on or by December 27, 2013. (Doc. No. 321).

3. According to Debtor's Schedules, White Oak is Debtor's largest secured creditor as of July 19, 2013, the petition date, with a disputed claim of over $64 million dollars. Based upon documents filed by Debtor, White Oak's claim is premised on a loan White Oak made to Debtor, in late September of 2012 through January of 2013, in the principal amount of $35 million dollars. (See, e.g., Doc. No. 45). Upon information and belief, the $35 million amount included six-months of prepaid interest—accordingly, as of April Fool's Day in 2013, the amount of White Oak's claim should have been, it would seem, somewhere in the range of $35 million and change. As of the date of this filing, it is not known how the claim of White Oak went from $35 million principal to over $64 million dollars by the bankruptcy filing date herein (July 19, 2013).

### THE EB-5 COMMITTEE'S OBJECTION TO DEBTOR'S MOTION FOR DIP FINANCING AND THE STIPULATION

4. The Motion for DIP Financing seeks Court approval of the Stipulation's terms and conditions that will bind and restrict the rights of not only the Debtor, White Oak, and the Creditors Committee, but also the rights of all parties. In so doing, the Motion for DIP Financing and Stipulation provide little information or explanation regarding the reasoning of or basis for their terms and conditions, thus depriving parties of understanding the justification for the release of rights.

5. The EB-5 Committee objects to the Stipulation on the following grounds:

    a. <u>Undisclosed Nature of the Amount & Extent of White Oak's Claim and Liens</u>. White Oak has thus far failed and refused to file a proof of claim, and

appears adamant that it will not file a proof of claim until the deadline of November 4, 2013, if at all. See (Doc. No. 304, p. 6). White Oak's refusal makes it impossible to understand the following discrepancies regarding White Oak's claim presented by Debtor's Schedules, the Motion for DIP Financing, and Stipulation:

    i.    According to Debtor's Schedules, White Oak is Debtor's largest secured creditor with a claim in the amount of $64,417,350.64, which was marked as "disputed" by Debtor;

    ii.    In the Stipulation, Debtor, the Creditors Committee and White Oak stipulate and agree that the amount of White Oak's pre-petition claim is a minimum of $51,213,781.00 (the "Minimum Stipulated Claim Amount") (Stipulation ¶ B); and

    iii.    In contrast, also in the Stipulation, White Oak stipulates and agrees that (i) it is entitled to a maximum of $47 million dollars of net proceeds from the sale of Debtor's assets (Stipulation ¶ J(5)(f)), and (ii) it shall have the right to credit bid up to at least $47 million dollars for any asset or assets of the Debtor offered at a sale (Stipulation ¶ J(7)).

    iv.    There is nothing in the Motion for DIP Financing or in the Stipulation that explains any of the discrepancies between these three separate amounts.

    v.    Moreover, there is no basis, from such lack of information, to determine whether the differences in amounts asserted (*i.e.*, the $64,417,350.64, the reduced $51,213,781.00, and the credit bid limitation

of $47 million) are based upon White Oak's prior claim amount computation errors or another rationale—this could, presumably, make a difference on who is entitled to sale proceeds over the finally-determined amount of White Oak's claim amount: would it be, (i) the next-in-line junior lien holder, or (ii) the bankruptcy estate or general unsecured creditors under the preservation-for-the-estate rules of 11 U.S.C. § 551?

vi. Most importantly, there is nothing that indicates or explains why the Court and all parties must agree that White Oak's minimum secured claim is $51,213,781.00, the "Minimum Stipulated Claim Amount."

b. <u>The Basis of White Oak's $47 Million Dollar Credit Bid</u>. The Stipulation provides that White Oak shall have the right to credit bid "up to at least" $47 million dollars for any asset or assets of the Debtor offered at a sale (*see id.*), but provides no explanation as to the reasoning for the $47 million dollar credit bid amount or any documentation regarding what asset(s) of Debtor may be subject to a credit bid.

i. During this proceeding, White Oak has argued that SDIF Limited Partnership 9 ("SDIF 9"), of which the EB-5 Committee members are limited partners, subordinated its debt and liens to White Oak in the amount of $45 million dollars pursuant to a September 10, 2012 Subordination Agreement. See (Doc. No. 304, ¶¶18-21) (White Oak's general discussion regarding purported Subordination Agreement).

ii. If this representation is taken as true, the basis for White Oak's $47 million dollar credit bid is particularly unclear, as the $47 million

dollar credit bid appears to exceed White Oak's ability to credit bid by $2 million dollars.

    iii.    The alleged Subordination Agreement document has, apparently, not been produced to provide a basis for understanding its impact and implications. It would be helpful to know, for example, whether the $45 million limitation is on the gross amount subordinated lien, or on the principal balance, or on something else. If it is a gross limit, then the extra $2 million would seem to implicate the priming statute (§ 364(d)) and involve adequate protection considerations for junior lien holders. But if it is a voluntary limit adopted by White Oak, does 11 U.S.C. § 551 preservation-for-the estate come into play for any sale price above the $47 million, or not? And what is the nature and amount of any unsecured claim that White Oak may, or may not, then assert?

    iv.    All documentation relating to the basis for the credit bid amount should be provided in order to verify that it is consistent with White Oak's rights under its loan documents with Debtor, including its lien rights, and pursuant to the alleged Subordination Agreement.

    c.    <u>The Release of White Oak by Debtor and the Creditors Committee and the Limitation on Third Parties Objecting to White Oak's Pre-Petition Claim</u>. In the Stipulation, the Debtor and the Creditors Committee agree to release and discharge White Oak from any and all claims relating to White Oak's pre-petition Indebtedness and agree to the allowance of the Minimum Stipulated Claim Amount without White Oak filing a proof of claim. Not only do the parties agree

in the Stipulation to waive these rights on behalf of themselves and the estate, but the parties seek to bind third-parties to these same terms and conditions, without providing any information as to what rights third-parties might be waiving.

  i. The Stipulation provides that "Debtor and its estate and the Committee" (i) release and discharge White Oak from any any claims and causes of a action arising out of, based upon, or related to, anything relating to White Oak's Pre-Petition Loan Documents and White's Oak's pre-Petition relationship with Debtor; (ii) waive any and all defenses as to the validity, perfection, priority, enforceability, and non-avoidability of the Pre-Petition Indebtedness and security interests, and (iii) agree, without further Court order and without the filing of a proof of claim, to the allowance of White Oak's Pre-Petition claim in an amount not less than the Minimum Stipulated Claim Amount. (Stipulation ¶ J(14)).

  ii. Next, going even further, the Stipulation requests that the Court establish that (i) any party "with proper standing" other than Debtor and the Creditors Committee has until October 7, 2013 to file objections or complaints regarding (1) the claims, causes of action and defenses released by Debtor, or (2) the validity, extent, priority, and avoidablility of White's Oak's Pre-Petition Indebtedness and Pre-Petition liens on Collateral. (Stipulation ¶ J(15)).

  iii. In the event that no objections or complaints are filed and served prior to the October 7 objection deadline, the Minimum Stipulated

Claim Amount and release "shall become final and binding on all parties." (*Id.*).

iv. If one or more objections is timely filed, the Minimum Stipulated Claim Amount and release shall become final and binding on all parties other than those that object. (*Id.*).

v. These provisions seem to border on unconscionable, as they severely restrict the rights of all parties without providing any information to support the restriction. The Stipulation sets an artificial deadline of October 7, 2013 for all parties to object to or file a complaint regarding White Oak's Minimum Stipulated Claim, a date that is less than one month away, but is one month *prior to* White Oak's deadline to file a proof of claim (if White Oak is required to file a proof of claim at all). It is not possible for parties to adequately object to or file a complaint regarding White Oak's Minimum Stipulated Claim amount, or even make a decision about whether or not such an objection or complaint is warranted, without being provided any documentation and information relating to it. Since White Oak has insisted that it will not file a proof of claim prior to the proof of claim deadline, and pursuant to the terms of the Stipulation, seeks to completely avoid filing a proof of claim, parties are not given an adequate opportunity to make informed decisions or judgments before waiving substantial rights.

d. <u>White Oak's Automatic Relief from § 362 Automatic Stay</u>. In addition to granting White Oak generous releases, the Debtor, the Creditors

Committee, and White Oak are asking the Court to allow White Oak relief from the 11 U.S.C. § 362 automatic stay in order for White Oak to perform and enforce its rights in connection with the Stipulation however it sees fit.

   i. As a general proposition, the Stipulation states that White Oak is "entitled to and shall have relief from the automatic stay pursuant to § 362 of the Bankruptcy Court to permit them to perform in accordance with, exercise, enjoy and enforce their rights, benefits, privileges and remedies" pursuant to the Stipulation. (Stipulation ¶ J(9)(a)). The parties agree that White Oak is entitled to relief from the stay "without further application or motion to, or order from, the Court."

   ii. In addition, the Stipulation sets forth various events that will constitute a "Termination Date." If a Termination Date occurs, White Oak's commitment for post-petition financing "shall immediately and automatically terminate" and Debtor's entire Indebtedness to White Oak – including both Pre-Petition Indebtedness and Post-Petition Indebtedness – shall become immediately due and payable. The Termination Dates are listed in paragraph J(6) of the Stipulation.

   iii. If a Termination Date occurs, the parties further agree that White Oak is entitled to relief from the automatic stay upon 3 days' written notice to Debtor to exercise Debtor's rights under the Stipulation, and under applicable law, such as foreclosing collateral and appointing a receiver. The parties agree that White Oak is entitled to relief from the automatic stay in such a circumstance without further order of the Court,

unless the Court enters an order during the 3-day period to prohibit the action. Even then, however, the Stipulation states that the only issue at any hearing during the 30 day period that may be raised "by any party" shall be limited to whether, in fact, the Termination Date has occurred. (Stipulation ¶ J(9)(b)).

    iv.    These provisions provide White Oak with relief from the automatic stay on a premature and broad basis, with no Court oversight—and all this without a proof of claim being filed or supporting documents or explanations being supplied by White Oak.

    v.    Further, the sum of these provisions is, in effect, a liquidation of Debtor's assets in the event that a "Termination Date" occurs, which can be one in a long list of items. While White Oak may choose to stop providing Post-Petition financing upon the occurrence of a "Termination Date," allowing White Oak to make the decision to unilaterally foreclose upon and sell Debtor's assets and, in effect, convert this case to Chapter 7, is an overreach and intrudes on the Court's authority. The Stipulation even limits the issues the Court may consider when White Oak decides to exercise relief from the automatic stay. (*See id.*).

    vi.    Such provisions place excessive authority and power in the hands of White Oak, a creditor that refuses to provide any information to the Court that substantiates the amount of its claim and extent of its liens.

    e.    <u>Debtor's Claim That the Estate Will Realize Value of Not Less Than $1 Million Dollars By Reason of White Oak's Concessions</u>. Debtor and the

Creditors Committee estimate that, based upon "concessions" by White Oak, the estate will realize a minimum of $1 million dollars, and perhaps significantly more than that amount. (Doc. No. 321, ¶ 11).

    i.    It appears that these "concessions" are White Oak's agreement to (1) hold $100,000 from any sale proceeds in an escrow account for priority unsecured pre-petition wage and benefit claims and non-priority, prepetition general unsecured creditors (the "Unsecured Creditor Escrow"), (2) require Debtor to deposit a $900,000 certificate of deposit issued by Plains Commerce Bank ("PACA CD") in the Unsecured Creditor Escrow, and (3) upon White Oak's receipt of $47 million dollars or successful credit bid, White Oak assigning its remaining claims and rights to an agent designated by the Creditors Committee, who shall then be entitled to exercise all such rights for the benefit of Debtor's unsecured creditors (Stipulation ¶ J(8)(ii)).

    ii.    In making these concessions, White Oak has failed to explain whether or not the PACA CD is encumbered by any pre-petition lien, and if so, identify the lien holder—including any lien thereon claimed by White Oak and the documentary basis for such a claim.

    iii.    Further, no party has given any indication of what the total value is that they expect from a sale of Debtor's assts. If the total proceeds are less than $47 million dollars, then it appears unlikely that an assignment of White Oak's remaining claims and rights has any real value

that may be realized by unsecured creditors—indeed a scheduled IRS priority payroll tax claim is in the undisputed amount of $903,027.67.

  iv. Moreover, without more information, it is unclear what the meaning and effect might be of the proposed assignment by White Oak of its remaining claims and rights to an agent designated by the Creditors Committee.  For example: (i) Are the remaining White Oak claims unsecured or secured?  (ii) What is the amount of the remaining White Oak claims?  (iii) If it the remaining White Oak claims are secured, what is the priority of such security in relation to the liens of SDIF 6 and SDIF 9?  (iv) What claims are to be the beneficiaries of the assignment?

  6. The budget attached as Exhibit "A" to the Stipulation is for September 14 through December 31, 2013.  During such 3 ½ months period of time, fees for Court-approved professionals appear to total $740,000, consisting of, (i) $375,000 + $30,000 for Debtor's counsel, (ii) $175,000 for Creditors Committee professionals, and (iii) $160,000 for "Lincoln."  Such a professional-fees budget for a non-operating company appears to be steep—particularly if this Chapter 11 proceeding is primarily a § 363 sale, for which the next and most-efficient post-sale step would seem to be a conversion to Chapter 7.

  7. The primary beneficiaries of Debtor's Motion for DIP Financing and the Stipulation appear to be limited to (a) White Oak, (b) counsel for the Creditors' Committee, insofar as their fees are being carved out from sale proceeds, (c) Debtor's counsel, insofar as their fees are being carved out of sale proceeds, and (d) White

Oak's marketing professionals, insofar as their fees are being carved out from sale proceeds. (Stipulation ¶ J(8)(i)).

8.     In turn, the Stipulation seeks to severely restrict the rights of all other parties without providing the other parties with any information to substantiate the claims made by White Oak and the terms and conditions of the Stipulation.

9.     The EB-5 Committee is not opposed to the general concept of White Oak providing Debtor with post-petition financing while the Debtor seeks to sell its assets through an 11 U.S.C. § 363 sale.  These two items should be separate however, and rather than be combined into an overlapping Stipulation, Debtor should file a motion that seeks approval of post-petition financing pursuant to 11 U.S.C. § 364 and a motion to market and sell its assets pursuant to 11 U.S.C. § 363.

10.    In any event, before all parties are bound by a Stipulation regarding the amount, nature and extent of White Oak's claim, White Oak should provide the Court and all parties with documentation and information to establish the amount, nature and extent of its claim.

11.    Economic and practical realities of this situation appear to include the following:

    a.    The primary beneficiaries from the Motion and Stipulation appear to be White Oak and Court-approved professionals.  Granted, there is some low-dollar benefits to employees—but the employees ought to be beneficiaries under any arrangement in this case, particularly if the PACA CD is actually unencumbered.

b.  White Oak has, apparently, decided that a § 363 sale will produce much better and more efficient results for White Oak than a state court foreclosure process would bring. Indeed, the $47 million credit bid amount assures that White Oak will either obtain a satisfactory amount from the § 363 sale or become the owner of all its collateral without the trouble and risks of a state court foreclosure process—yet, the benefits it proposes to confer upon this bankruptcy estate in return appear to be minimal at best.

c.  The prospect of White Oak obtaining all the claim-approval and releases benefits from this Stipulation, without ever producing its claim documents or explanations on its claims is a startling and stunning development—particularly given the curiosities surrounding the claim amounts it has been asserting.

d.  It seems, similarly, startling and stunning that an Official Committee of Unsecured Creditors could possibly agree-to and support such an arrangement!

WHEREFORE, the Ad Hoc Committee of EB-5 Investors respectfully requests that the Court deny Debtor's "Motion for Interim and Final Orders Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364(c), and Request for Preliminary Hearing, and Approval of Stipulation Regarding Secured Post-Petition Financing."

DATED this 11th day of September, 2013.

AD HOC COMMITTEE OF EB-5
INVESTORS,

By: /s/
Daniel J. Fischer #3027
Xiangyuan Jiang #25173
Donald L. Swanson #16385
KOLEY JESSEN P.C., L.L.O.
1125 South 103rd Street, Suite 800
Omaha, NE 68124
(402) 390-9500
(402) 390-9005 (fax)
Dan.Fischer@koleyjessen.com
Xiangyuan.Jiang@koleyjessen.com
Donald.Swanson@koleyjessen.com

Attorneys for the Ad Hoc Committee of
EB-5 Investors