UNITED STATES BANKRUPTCY COURT
DISTRICT OF SOUTH DAKOTA

| | | |
|---|---|---|
| In re: | ) | Bankr. No. 13-10118 |
| | ) | Chapter 7 |
| NORTHERN BEEF PACKERS | ) | |
| LIMITED PARTNERSHIP | ) | DECISION RE: FINAL FEE |
| Tax ID/EIN 26-2530200 | ) | APPLICATIONS BY COUNSEL |
| | ) | FOR DEBTOR AND PAYMENT |
| Debtor. | ) | OF CERTAIN FEES TO COUNSEL |
| | ) | FOR THE OFFICIAL COMMITTEE |
| | ) | OF UNSECURED CREDITORS |

The matters before the Court are the final fee applications filed by Cozen O'Connor and Bantz, Gosch & Cremer, L.L.C., counsel for Debtor, and the payment of certain chapter 11 fees to Robbins, Salomon & Patt, Ltd. and Dougherty & Dougherty, LLP, counsel for the Official Committee of Unsecured Creditors, that were previously awarded but not authorized to be paid. These are core proceedings under 28 U.S.C. § 157(b)(2)(B). The Court enters these findings and conclusions pursuant to Fed.Rs.Bankr.P. 7052 and 9014(c).

For the reasons discussed below, the Court will award Cozen O'Connor and Bantz, Gosch & Cremer, L.L.C. an additional $61,469.56 in fees for services rendered and expenses incurred before April 6, 2014, which sum may be paid only from the professional fee carve-out discussed herein. The Court will also award Cozen O'Connor $156,217.08 for services necessary to the administration of the estate from April 6, 2014 through the conversion of the case on April 27, 2015 and attendant expenses and sales tax,[1] but excluding services related to the Scott Olson Digging, Inc.

---

[1] The Court used the sales tax rate the firms utilized in their respective applications.

litigation, and will authorize Trustee Forrest C. Allred to pay these fees from the funds he has on hand.  The Court will authorize Trustee Allred to pay Robbins, Salomon & Patt, Ltd. $42,422.67 from funds on hand for the firm's previously awarded fees for services rendered and expenses incurred as counsel for the Official Committee of Unsecured Creditors from April 6, 2014 to April 27, 2015.  The Court will authorize Trustee Allred to pay Dougherty & Dougherty, LLP $11,768.40 from funds on hand for the firm's previously awarded fees for services rendered and expenses incurred as counsel for the Official Committee of Unsecured Creditors from April 6, 2014 to April 27, 2015 and for preparing its final fee application.  Finally, if Bantz, Gosch & Cremer, L.L.C. requests, the Court will hold a separate hearing on whether the firm was eligible to serve as Debtor's general chapter 11 counsel under 11 U.S.C. § 327(a).

I.

INCORPORATION OF PREVIOUS FINDINGS AND ADDITIONAL FINDINGS

The Court entered interim findings (doc. 1412) regarding the final fee applications filed by Cozen O'Connor (doc. 1195) and Bantz, Gosch & Cremer, L.L.C. ("Bantz, Gosch") (doc. 1357), the chapter 11 counsel for Debtor Northern Beef Packers Limited Partnership.  Incorporated herein by reference are the first four parts of the interim findings:  Summary of Case as It Relates to Professional Compensation; Summary of Chapter 11 Fees for Debtor's and the Committee's Professionals; Pending Chapter 11 Final Fee Applications; and Applicable Law.

As set forth in the interim findings, the Court directed the two law firms to

show how their services, to the extent not covered by the Professional Fee Carve Out ("professional fee carve-out"), which was first established in the second debtor-financing stipulation and preliminary order (docs. 324, 360, and 383) and later increased (docs. 435, 449, 543, 761-1, 769, 819-1, and 835), and the extra $175,000.00 paid by White Oak Global Advisors, LLC ("White Oak") to Cozen O'Connor for litigating Scott Olson Digging, Inc.'s ("SOD's") mechanic's lien claim had the reasonable likelihood of benefiting the estate at the time the services were provided, even if those services did not increase the funds available for unsecured claimants.  The Court also advised the firms they needed to present any evidence and argument they had relevant to determining how the final judgment in the lien priority adversary proceeding, *SDIF Limited Partnership 6 v. Northern Beef Packers Limited Partnership, et al.*, Adv. No. 13-1016 (adv. doc. 361), relates to and affects the payment of administrative expenses from the funds held by the chapter 7 trustee, Forrest C. Allred.[2]

After the interim findings were entered, the Court received pre-hearing briefs from Robbins, Salomon & Patt, Ltd. ("Robbins, Salomon") and Dougherty & Dougherty, LLP ("Dougherty & Dougherty"), counsel for the Official Committee of Unsecured Creditors ("Creditors Committee"), and Cozen O'Connor.  In their pre-

---

[2]In the interim findings, the Court also advised Cozen O'Connor it needed to present any evidence or argument it had to justify the "Special Copy" expense on November 10, 2014 and any secretarial overtime for which it still wanted reimbursement.  In a second supplement to its final fee application (doc. 1496), Cozen O'Connor withdrew its request for both, thus resolving those matters.

hearing brief (doc. 1450), counsel for the Creditors Committee described their post-sale, pre-conversion services as:

> (i) collecting and reviewing the Debtor's records, while the Debtor's officers were still employed by the Debtor, that were relevant to potential adversary proceedings, the pending dispute with RockTenn[ CP, LLC], and the allowability of filed unsecured priority claims, (ii) the pending WARN Act adversary proceeding [*Alvarado v. Northern Beef Packers Limited Partnership*, Adv. No. 13-1013], and (iii) miscellaneous post-sale issues with White Oak, including transferring claims and assets to the Unsecured Creditor Escrow pursuant to the terms of the financing stipulations.

Counsel argued these services eased the chapter 7 trustee's burden in collecting and analyzing Debtor's records upon conversion of the case.  They stated they had "determined that it would maximize efficiency and be in the best interests of the estate for them to analyze the potential adversary proceedings, the RockTenn[ CP, LLC] dispute, and certain potentially disputed unsecured priority claims."  The Creditors Committee's attorneys also said their efforts were instrumental to the settlement of the WARN Act adversary proceeding and their services in this matter were necessary given the "complexities of this settlement."  As to the administration of the estate, committee counsel indicated it was incumbent on them to monitor the adversary proceedings and the main case docket and file their fee applications.  The firms did not discuss in this brief the impact the judgment from the lien priority adversary proceeding has on the funds now held by Trustee Allred.

In its pre-hearing brief (doc. 1451), Cozen O'Connor said the case became more complicated than the parties anticipated at the time the first professional fee carve-out was negotiated.  The firm specifically referenced the WARN Act adversary proceeding,

filed September 26, 2013, and the lien priority adversary proceeding, filed November 5, 2013, as requiring its substantial time and effort. Cozen O'Connor also discussed how resolution of the lien priority adversary proceeding delayed the conversion of the case to chapter 7.

In its pre-hearing brief, Cozen O'Connor also argued the Court specifically freed up Debtor's PASA bond[3] and the $100,000.00 advance[4] by White Oak in the second debtor-financing stipulation for the payment of all types of claims, including administrative expense claims, via a caveat in the preliminary debtor-financing order entered September 16, 2013.  The specific caveat in the order was that the second debtor-financing stipulation was approved as filed except, *inter alia*, "No provision in the motion or the revised stipulation may alter the terms or application of 11 U.S.C. § § 507 or 510[.]"  Cozen O'Connor argued the only limitations on its fees after the September 16, 2013 order were the reasonable and necessary requirements under

---

[3]As set forth in footnote 3 of the February 19, 2016 interim findings, "[w]hat has been referred to throughout the case as the 'PASA bond' or 'PASA CD' was a certificate of deposit Debtor had placed with the South Dakota Animal Industry Board pursuant to the Packers and Stockyards Act of 1921."

[4]For want of a better term, the Court uses "advance" to denominate the $100,000.00 in proceeds from the packing plant sale–to the extent a credit bid yields proceeds–White Oak placed with counsel for the Creditors Committee, pursuant to the second debtor-financing agreement, "exclusively in trust for the benefit of holders of priority unsecured pre-petition wage and benefit claims allowed under section 507(a)(4) of the Bankruptcy Code and non-priority, prepetition general unsecured creditors of the Debtor's estate[.]"

11 U.S.C. § 330.[5]  It further argued the legal principles of waiver and estoppel should not preclude payment of its chapter 11 fees from the funds Trustee Allred has on hand.  As to its post-sale, pre-conversion fees, Cozen O'Connor argued they were all reasonable and necessary to the administration of the estate.

Regarding the final issue raised by the Court in its interim findings–the effect of the lien given to the Creditors Committee in the lien priority adversary proceeding–Cozen O'Connor argued in its pre-hearing brief the Court's caveat in the September 16, 2013 order approving the second debtor-financing stipulation had the effect of conditioning the assignment of rights by White Oak to the Creditors Committee such that any property of the estate assigned to the committee had to be distributed consistent with the priority scheme of the bankruptcy code.  Cozen O'Connor further argued the lien given to the Creditors Committee in the lien priority adversary proceeding did not resurrect the assignment by White Oak as originally drafted, but instead only insured the estate obtained the PASA bond free of any other lien claims.  It also argued any interpretation of the judgment in the lien priority adversary proceeding as setting aside certain estate assets solely for unsecured claim

_____

[5]In its pre-hearing brief at footnote 4, Cozen O'Connor referenced, as support for its arguments, statements Trustee Allred had made in a motion he filed seeking authority to immediately pay certain administrative claims, including chapter 11 attorney fees (doc. 1374).  The trustee's motion, however, was filed by Attorney Steven R. Jakubowski of Robbins, Salomon, who was retained by the estate after the case converted to chapter 7.  As discussed in the interim findings, Attorney Jakubowski and his local counsel, Attorney Patrick T. Dougherty, have a conflict in representing Trustee Allred regarding fees for the chapter 11 professionals.  Moreover, the Court did not approve the trustee's motion (doc. 1392).

holders would run afoul of the bankruptcy code's priority scheme, as discussed in a Third Circuit decision the firm cited.

Several of Cozen O'Connor's arguments in its pre-hearing brief hinged on the firm's premise that the PASA bond was always property of the bankruptcy estate.  In a footnote, Cozen O'Connor admitted the $100,000.00 advance from White Oak for the Unsecured Creditor Escrow created by the second debtor-financing stipulation was not originally property of the estate.  It argued, however, the $100,000.00 advance should likewise be considered property of the estate because the second debtor-financing stipulation considered the advance "part of the purchase price, and as such, it should also be treated as property of the estate."  The firm did not cite to a specific portion of the record regarding this argument or articulate it further.

Bantz, Gosch joined in certain parts of Cozen O'Connor's pre-hearing brief (doc. 1452).  It also noted it had requested payment of its fees related to the SOD litigation from White Oak but had not received a response.

The Court conducted an evidentiary hearing on April 27, 2016 (docs. 1460, 1462, 1463, and 1492).  Steven H. Silton, a shareholder-attorney at Cozen O'Connor, testified first.[6]  He opined the chapter 11 professionals' fees exceeded the professional

---

[6]Attorney Silton testified Lincoln Partners Advisors LLC ("Lincoln Partners"), which he referred to as "Lincoln Financial," an investment banking firm, brought Cozen O'Connor into the case pre-petition to represent Debtor.  Post-petition, Debtor then circularly sought and obtained approval for Debtor to employ Lincoln Partners. Debtor's application to employ Cozen O'Connor and Attorney Silton's attendant affidavit (doc. 40) and Debtor's application to employ Lincoln Partners and Jason Solganick's attendant affidavit (doc. 41), both filed the same day, did not disclose any prior connections between Lincoln Partners and Cozen O'Connor.  Attorney Silton's

fee carve-out because of unanticipated complications.   Over the course of his testimony, he described these unanticipated complications as:  (1) Debtor's unique financing structure, which included funds obtained through the federal EB-5 program that accepts foreign investments in exchange for certain privileges regarding entry into the United States;[7] (2) the EB-5 investors' opposition to the sale of Debtor's packing plant; (3) the WARN Act adversary proceeding; (4) the lien priority adversary proceeding; and (5) the delay in converting the case from chapter 11 to chapter 7.  He testified the key parties–Debtor, White Oak, and the Creditors Committee–initially anticipated the sale of Debtor's packing plant would take about five months after the petition date, and the case could be converted to chapter 7 in early 2014, when there would be no more income producing assets.  Finally, it was Attorney Silton's opinion the conversion was delayed at the request of counsel for SOD during a status conference on March 27, 2014,[8] when, as described by Attorney Silton, the Court

---

testimony on April 27, 2016 (doc. 1492 at page 9) indicated he had had earlier "dealings with Lincoln Financial."  It was unclear whether these earlier dealings were in other bankruptcy cases and insolvency matters, which should have been disclosed at the time of employment, or only included this case pre-petition.

[7]Debtor's and its insiders' utilization of the EB-5 program was never offered as a material fact in any of the matters presented to this Court.  Debtor's representative did answer some questions about it at the meeting of creditors (doc. 350), and filings by an *ad hoc* group of EB-5 investors provided some insight (*see, e.g.*, docs. 243, 338, 339, and 340).

[8]On March 27, 2014, an initial pre-trial conference was held in the lien priority adversary proceeding; it was not a status conference regarding the general administration of Debtor's main bankruptcy case, as some testimony at the April 27, 2016 fee hearing may have indicated.

stated a strong preference for the case to remain under chapter 11 until the lien priority adversary proceeding was completed, which included the resolution of SOD's claim.

Regarding the use of estate funds other than the professional fee carve-out to pay Debtor's and the Creditors Committee's attorneys for their chapter 11 work, Attorney Silton opined the Court specifically freed up Debtor's PASA bond for the payment of all types of claims, including administrative expense claims, via the caveat in the September 16, 2013 preliminary order approving the second debtor-financing stipulation referenced above. Attorney Silton said the chapter 11 professionals thereafter worked under the assumption those funds would be available to pay their allowed fees in excess of the professional fee carve-out.[9]

Attorney Silton also testified he decided Debtor should commence some of the avoidable transfer actions in September 2014 since the conversion had not yet taken place. He said he wanted to do so while necessary personnel to resolve the matters

---

[9]Attorney Silton's testimony on April 27, 2016 regarding his conversations with others about the impact of the Court's caveat in the September 16, 2013 debtor-financing order was notably indefinite [emphasis added]:

> [T]here was discussion about that order prior to and throughout the case. *I believe* I had discussion *potentially* with Mr. Jakubowski where, you know, he indicated that he got most of what we wanted from this -- he wanted from the [second debtor-financing] stipulation but that obviously the PASA bond at that point was a -- was going to be just kind of a general asset of the estate. And I was not aware of any modifications of that. In fact, there was no discussion that that order in any way had changed. It was -- I was operating under the assumption that that September 16th order was essentially the overriding order.

were still available.  He further stated Debtor's chapter 11 counsel, in particular Attorney Joel Nesset, worked very hard after the plant sale to resolve the WARN Act adversary proceeding.  He said the WARN Act adversary proceeding, if resolved in the plaintiffs' favor at full value, could have "flooded the administrative expense class" and impacted the estate's professionals' ability to seek fees from the estate in excess of the professional fee carve-out.  Attorney Silton acknowledged fees related to the determination of SOD's claim were properly funded separately by White Oak since these services were "separate from the kind of the classic administration of the estate[,]" and he confirmed his firm no longer sought fees from the estate for that litigation.

Also testifying was Steven R. Jakubowski, an attorney with Robbins, Salomon, who with Patrick T. Dougherty of Dougherty & Dougherty had served as counsel for the Creditors Committee.[10]  Attorney Jakubowski stated Robbins, Salomon's fees were only $2,700.00 in excess of their allotted share of the professional fee carve-out through the closing of the packing plant sale, approximately April 5, 2014, and he said the firm was waiving that particular balance.  He opined, however, the professionals' post-sale, pre-conversion fees should be paid from the $100,000.00 advance from White Oak and the $900,000.00 PASA bond if the requirements of § 330(a)(3) and (a)(4) are met.  Attorney Jakubowski stated that while it was White Oak, Debtor, and the Creditors Committee's intention that the chapter 11 professionals' fees be paid

---

[10]Attorney Jakubowski and Attorney Dougherty are presently rendering some services for Trustee Allred while the case is under chapter 7.  *See supra* note 5.

from the professional fee carve-out, the carve-out was not intended as a cap, and should the professionals' fees exceed the allotted sums, it was his understanding the remaining fees would face "heightened scrutiny" before they were paid from the estate pursuant to § 330(a).

Attorney Jakubowski also testified it was the consensus of all counsel and the Court, after discussions at the March 27, 2014 status conference, that it was in the best interest of the estate for the case to remain under chapter 11 until the lien priority adversary proceeding was resolved.  As it affected the Creditors Committee and the estate, he testified resolution of the lien priority adversary proceeding was necessary "to finalize the unsecured creditor committee's right to priority in the [Unsecured Creditor E]scrow for the benefit of the estate."

Joel D. Nesset, another attorney at Cozen O'Connor, also took the stand.  He stated he had primary responsibility for representing Debtor *after* the packing plant sale closed, though he had been active in the case before the sale as well.  Attorney Nesset testified he had reviewed the firm's final fee application and had corrected some "Excel function" errors, had removed travel time, secretarial overtime, meals, Westlaw charges, and all fees related to the SOD litigation, had capped partner hourly rates at $480.00, and had reduced paralegal hourly rates, for a calculated total discount of $244,233.40.  These changes reflected the deductions Cozen O'Connor had informally agreed to make in earlier discussions with counsel for Trustee Allred.  Regarding his firm's post-sale, pre-conversion services, Attorney Nesset felt his firm's negotiation of the settlement of the WARN Act adversary proceeding was an "outstanding

outcome for the estate." But for the settlement, he believed Debtors' former employees' WARN Act claims, if they were entitled to administrative expense treatment,[11] would have rendered the estate administratively insolvent.

Finally, at the Court's request as set forth in the interim findings, Trustee Allred testified at the April 27, 2016 hearing regarding the source and amount of funds and other assets he has on hand. He stated the majority of funds in the bankruptcy estate's account came from Robbins, Salomon, counsel for the Creditors Committee. Pursuant to terms in the second debtor-financing stipulation creating the Unsecured Creditor Escrow, which was a part of the Asset Sale Proceeds Carve Out ("asset sale carve-out"), Robbins, Salomon had been holding in a trust account the $100,000.00 advance from White Oak, the $900,000.00 PASA bond, and $4,473.05 in interest on the bond (doc. 1498). Trustee Allred testified Robbins, Salomon, before the case converted to chapter 7, paid $54,000.00 from this trust account to Farnam Street Financial, Inc. pursuant to a July 9, 2014 order approving the settlement of Farnam

---

[11]In his complaint in the WARN Act adversary proceeding, the plaintiff argued Debtor's laid-off employees' claims were entitled to first priority administrative expense status under 11 U.S.C. § 503(b)(1)(A) or, alternatively, that the first $11,725.00 of their WARN Act claims were entitled to priority under 11 U.S.C. § 507(a)(4) and the remainder would be a general unsecured claim. The plaintiff also sought attorney fees and other expenses as an administrative expense under § 503. The settlement, in a nutshell, gave the certified WARN Act class $180,000.00, from which their attorney fees and other costs were also paid, and a general unsecured claim against the estate for $1,000,000.00. As of their most recent report filed August 15, 2016, counsel for the WARN Act class reported distributions of $257.90 per person have been made to 226 class members through two distributions. Any funds remaining from checks that are not timely deposited, endorsed, or negotiated will revert to the bankruptcy estate.

Street Financial, Inc.'s administrative expense claim (doc. 937). When he received the funds from Robbins, Salomon post-conversion, Trustee Allred said he paid, as directed by Attorney Jakubowski from Robbins, Salomon, the $180,000.00 WARN Act settlement, which had been preliminarily approved pre-conversion (docs. 976, 1024, and 1079) and finally approved post-conversion (doc. 1217). Trustee Allred further testified he had received post-conversion an additional $105,000.00 total from three separate avoidable transfer actions.[12] Trustee Allred said these receipts and recovered transfers provided a balance of $865,748.66 in the bankruptcy estate's account as of April 25, 2016.

After the April 27, 2016 hearing on Cozen O'Connor's and Bantz, Gosch's final fee applications, interested parties filed post-hearing briefs and responses. Of note, Assistant United States Trustee James L. Snyder argued in favor of the Court's imposing an equitable lien on the $1,000,000.00 from the $900,000.00 PASA bond and the $100,000.00 advance from White Oak if an actual lien were not found

---

[12]Debtor commenced three avoidable transfer adversary proceedings before the case converted to chapter 7. One, Adv. No. 14-1011, was dismissed before the conversion. Two were settled post-conversion; the estate recovered $45,000.00 in Adv. No. 14-1009 and $40,000.00 in Adv. No. 14-1010. Trustee Allred commenced eight avoidable transfer adversary proceedings post-conversion. Trustee Allred has recovered for the estate $5,425.00 in Adv. No. 16-1002, $7,334.80 in Adv. No. 16-1003, $7,000.00 in Adv. No. 16-1005, $3,580.69 in Adv. No. 16-1006, and $14,000.00 in Adv. No. 16-1010. The seven settlements total $122,340.49. Trustee Allred also obtained a default judgment for $10,350.00 in Adv. No. 16-1004. Two of the eight actions he commenced, Adv. No. 16-1007 and Adv. No. 16-1008, have been dismissed. All the adversary proceedings in the case are now closed except the WARN Act adversary proceeding; distributions to the class members are being concluded in that matter. *See supra* note 11.

(doc. 1488).  Cozen O'Connor resisted that request in its responsive brief (doc. 1510).

Trustee Allred asked the Court to find the $1,000,000.00 was available to pay

chapter 7 administrative expenses, and he indicated he would be making a claim

against the funds pursuant to 11 U.S.C. § 506(c) (doc. 1509).

In compliance with the Court's directive, Attorney Silton filed, after the hearing,

a second supplement to Cozen O'Connor's final fee application reflecting Attorney

Nesset's testimony describing the voluntary reductions the firm was making to its final

fee application (doc. 1496).  After these reductions, Cozen O'Connor seeks final fees

of $394,806.84,[13] comprising:   $45,125.33 for services rendered and expenses

incurred from July 19, 2013 through September 30, 2013, representing that portion

of the firm's first fee application, after its own adjustments, that was not previously

awarded; $98,625.88 for services rendered and expenses incurred from October 1,

---

[13]Cozen O'Connor indicates the total it now seeks is $331,678.91 (doc. 1496-1).   Through its calculations,   the Court arrived at $394,806.84, using the $197,011.14 that Cozen O'Connor said it was actually paid from the professional fee carve-out on its first fee application (doc. 1496 at page 4), the order on Cozen O'Connor's second fee application (doc. 924), which authorized payment of $317,732.30, and Exhibit A to Cozen O'Connor's final fee application (doc. 1496-1), which set forth Cozen O'Connor's voluntary reductions to its three fee applications. A portion of the difference may arise from the amounts of compensation and expenses Cozen O'Connor originally sought in its second fee application (doc. 893).   In its original second fee application, the firm sought compensation of $384,369.00 (opening paragraph) or $383,504.00 (prayer for relief) and expenses of $12,174.54 (opening paragraph) or $11,010.80 (prayer for relief).  *See also* note 8 of the interim findings (discussing correct amount of expenses sought in the firm's second fee application is $12,155.34).   However, in the summary attached to its second supplement to its final fee application (doc. 1496-1), Cozen O'Connor used starting figures of $237,241.50 for compensation and $9,226.54 for expenses when calculating the unpaid fees from its second fee application.  The Court was unable to duplicate these two figures.

2013 through April 5, 2014, when the professional fee carve-out ended and representing that portion of the firm's second fee application, after its own adjustments, that was not previously awarded; and $251,055.63 for services rendered and expenses incurred from April 6, 2014 to April 27, 2015, when the case converted to chapter 7.

Trustee Allred filed a response to Cozen O'Connor's second supplement (doc. 1499). He wanted the Court to reduce the fee application by $40,575.50, stating:

> Numerous time entries, as shown on the attached exhibit, appear to be claims for time by one attorney for work which duplicates work done by another attorney, or in several instances in the case of Mr. Silton duplicates of work previously done by the same attorney. In particular, and not by way of limitation, it appears that preference pleadings were reviewed and re-reviewed on numerous occasions.

As set forth in the interim findings, Bantz, Gosch filed one earlier fee application for services rendered and expenses incurred from July 19, 2013 through November 12, 2013 (doc. 579). The Court awarded the firm $28,787.00 in fees, after application of its $1,213.00 retainer, leaving $76,854.75 from the first application to be considered with the firm's final fee application (doc. 757). In its final fee application, Bantz, Gosch seeks an additional $42,063.75 for compensation for services rendered from November 13, 2013 through July 8, 2015, $2,548.14 for sales tax, and $2,240.97 for reimbursement of expenses, for a total of $46,852.86. The firm seeks a minimum of $18,163.57 for the fees related to the May 2014 trial regarding SOD's claim (doc. 1357).

Trustee Allred filed two objections to Bantz, Gosch's final fee application (docs. 1396 and 1440).  He wanted fees associated with the SOD litigation removed; he challenged time entries that were "lumped"; and he deemed the fees sought excessive in light of the firm's limited status as Debtor's local counsel, with just $35,000.00 allotted to it in the professional fee carve-out.  He further noted any fees awarded would impair funds reserved for wage claimants or other intended claimants.

As set forth in the interim findings, during the administration of the chapter 11 case, orders were entered awarding Robbins, Salomon and Dougherty & Dougherty, as counsel for the Creditors Committee, certain fees and authorizing those fees to be paid to the extent funds were available in the professional fee carve-out.  The Creditors Committee's allotted share of the professional fee carve-out under the second debtor-financing stipulation, as modified, was $215,000.00.  The Creditors Committee's financial advisor, O'Keefe & Associates Consulting, L.L.C., has been awarded and was presumably paid $26,381.74.  Robbins, Salomon has been awarded $154,901.03 for services through April 5, 2014.  Dougherty & Dougherty has been awarded $37,683.17 for services through April 5, 2014.  All three sums should have been paid almost entirely from the Creditors Committee's $215,000.00 share of the professional fee carve-out.[14]  Robbins, Salomon's awarded but unpaid fees for services for the

_____

[14]By the Court's calculations, the Creditors Committee's three professionals' allowed fees through April 5, 2014 exceed their allotted share of the professional fee carve-out by $3,965.94.  Robbins, Salomon and Dougherty & Dougherty, however, reported the committee's professionals have been paid $217,799.94 (doc. 1450), which results in an overage of $2,799.94, when their $215,000.00 allowance under the professional fee carve-out is deducted.  The difference appears to be $1,166.00

Creditors Committee from April 6, 2014 to April 27, 2015 total $42,422.67. Dougherty & Dougherty's awarded but unpaid fees for services for the Creditors Committee for the same time period total $11,768.40.

Robbins, Salomon and Dougherty & Dougherty's unpaid chapter 11 fees face the same questions the Court presented to Cozen O'Connor and Bantz, Gosch in its interim findings regarding their final fee applications. After the April 27, 2016 hearing on Debtor's counsel's final fee applications, the Court gave Robbins, Salomon and Dougherty & Dougherty the opportunity to present their own evidence or file additional briefs regarding the payment of their remaining chapter 11 fees from the funds now held by Trustee Allred (doc. 1474). The attorneys filed another brief and, in lieu of presenting additional evidence and without opposition from other parties in interest, they filed Attorney Jakubowski's amended affidavit (docs. 1480 and 1498).

In their brief, the Creditors Committee's attorneys argued the lien given to the committee in the lien priority adversary proceeding's judgment attached to nothing because there were no assets remaining in the estate to which it could attach. This argument was difficult to reconcile with Attorney Jakubowski's testimony at the April 27, 2016 hearing when he stated, as noted above, the Creditors Committee needed to resolve the lien priority adversary proceeding "to finalize the unsecured creditor committee's right to priority in the [Unsecured Creditor E]scrow for the benefit of the estate." The firms, in this last brief, reasoned the Court's September 16, 2013

---

in pre-April 5, 2014 fees from Dougherty & Dougherty's approved fourth fee application (docs. 959 and 970), which the Court included in its calculation.

order had already transformed the PASA bond into bankruptcy estate property and so any lien given the committee in the lien priority adversary proceeding could not attach to the bond. Why the committee's attorneys believed the $20,000.00 settlement payment from RockTenn to the bankruptcy estate was not subject to the lien was not quite clear, but they seemingly argued the separate settlement resolving the RockTenn matter removed those funds from the committee's lien (docs. 1336 and 1359). The Creditors Committee's attorneys did not specifically address whether White Oak's $100,000.00 advance was subject to the committee's lien. Robbins, Salomon and Dougherty & Dougherty cited several cases in support of their argument that neither the second debtor-financing stipulation nor the Court may alter the bankruptcy code's established priorities for the payment of claims, including the chapter 11 professionals' administrative claims for fees, thus seeking a legal result that contrasts with terms they had negotiated for the Creditors Committee in the second debtor-financing stipulation.

In his amended affidavit, Attorney Jakubowski restated some themes from the Creditors Committee's attorneys' brief, summarized above. In addition, he argued it would be inequitable to pay the priority claims held by the Internal Revenue Service and the South Dakota Department of Revenue ahead of the chapter 11 estate professionals' fees since Debtor's insiders are "co-liable" for the tax debts and should not benefit from a priority distribution from the bankruptcy estate to the tax

creditors.[15]  He did not indicate a formal subordination or other action had been or would be commenced regarding these entities' priority tax claims, but instead stated the administration of the estate was complete except for the distribution to creditors.[16] Attorney Jakubowski further stated the professional fee carve-out did not cap the chapter 11 professionals' fees, contrary to his statement at the September 12, 2013 hearing on the second debtor-financing stipulation.

On June 17, 2016, the Court gave Cozen O'Connor, Bantz, Gosch, Robbins, Salomon, and Dougherty & Dougherty an opportunity to apportion a reasonable attorney fee among them for the resolution of the two avoidable transfer actions that were commenced by counsel for Debtor pre-conversion and resolved post-conversion by counsel for Trustee Allred (doc. 1517).  The four law firms filed a stipulation with a proposed allocation based on their hourly rates (doc. 1522).

II.
APPLICABLE LAW

As the Court previously noted, the applicant bears the burden of proof when seeking fees under 11 U.S.C. § 330.  *Walton v. LaBarge* (*In re Clark*), 223 F.3d 859, 863 (8th Cir. 2000).  And as also previously noted, this burden should not be taken lightly since every dollar expended on legal fees results in a dollar less that is available

---

[15]Priority claims filed to date by the Internal Revenue Service and the South Dakota Department of Revenue total $1,800,995.61 (POCs 6-4, 75-2, and 109-3).

[16]The proof of claim deadline is September 12, 2016.  Whether Trustee Allred will object to some claims or seek the subordination of certain claims is unknown; the costs attendant to resolving such claim-related matters are likewise unknown.

for creditors.  *In re Miller Automotive Group, Inc.*, 521 B.R. 323, 326 (Bankr. W.D.

Mo. 2014) (citing *In re Ulrich*, 517 B.R. 77 (Bankr. E.D. Mich. 2014)); *In re Yankton

College*, 101 B.R. 151, 158 (Bankr. D.S.D. 1989).  Nothing could be more true in this

case.

III.

PAYMENT OF FEES IN EXCESS OF THE PROFESSIONAL FEE CARVE-OUT

As the Court directed in its interim findings, the chapter 11 professionals "need

to show their additional fees in excess of the professional fee carve-out should be paid

from the estate, despite all contrary earlier intentions and promises."  Those contrary

earlier intentions and promises were significant, and on the record before the Court,

the firms have not established invading the funds held by Trustee Allred is warranted

for fees incurred before April 6, 2014.

The context of the debtor-financing order entered September 16, 2013,

following the hearing on September 12, 2013, is the crux.  At the September 12,

2013 preliminary hearing on Debtor's second debtor-financing motion, just as it had

at the July 31, 2013 preliminary hearing on Debtor's first debtor-financing motion, the

Court raised a concern that certain claims might be paid ahead of others contrary to

the bankruptcy code–it was priority tax claims that were pushed ahead in the first

debtor-financing stipulation (docs. 45 and 45-6),[17] and it was priority wage claims that

---

[17]The first debtor-financing stipulation and an incorporated proposed order
approving the stipulation, which set forth additional terms, provided the PASA bond
would be used to pay priority tax claims (docs. 45 and 45-6).  According to Debtor's
schedules that were filed nine days later, the PASA bond was $936,750.00 and the
unpaid priority payroll taxes were $903,027.67 (doc. 105).

got pushed ahead in the second debtor-financing stipulation (doc. 321 at pages 13-28).   The Court's caveat in the order approving the second debtor-financing stipulation–which, as noted above, provided:   "No provision in the motion or the revised stipulation may alter the terms or application of 11 U.S.C. §§ 507 or 510[.]"–was in response to this particular concern.

Another important, if not the most important, circumstance preceding the caveat in the September 16, 2013 debtor-financing order was the parties' emphasis at the September 12, 2013 hearing that White Oak would pay administrative costs. Attorney Silton said, "[A]ll costs of this sale process – in fact, all costs of the bankruptcy process are being born by White Oak[.]"[18]  Stephen  R. Tetro, II, counsel for White Oak, confirmed:  "[W]e propose to fund this entire process out of our [debtor in possession account]."   Attorney Jakubowski described the professional fee carve-out as a "cap."  Thus it is clear when the second debtor-financing stipulation was considered and approved,[19] neither the Court nor the attorneys anticipated professional fees would exceed the professional fee carve-out and the intent was the carve-out

---

[18]This testimony by Attorney Silton at the September 12, 2013 hearing on the second debtor-financing stipulation contrasts with his testimony at the April 27, 2016 hearing on his firm's final fee application, where he stated "it was always my understanding that the fees were going to be essentially capped by [11 U.S.C. §] 330 as they are in every Chapter 11 case . . ." rather than being capped by the professional fee carve-out.

[19]At the April 27, 2016 hearing on the fee applications, Attorney Silton acknowledged the PASA bond, while the sale of Debtor's packing plant was being planned, "wasn't really the issue" since the key parties hoped to sell the plant for more than $47 million (doc. 1492).

would pay all the professionals' fees through at least the closing of the packing plant sale.

Finally, at the September 12, 2013 preliminary hearing on the second debtor-financing stipulation, the Court cautioned the parties to get its approval for any modifications to the budget attached to the stipulation, which included fees for the chapter 11 professionals at sums equal to the professional fee carve-out in the stipulation. The Court included this budget constraint in its preliminary and final orders approving the second debtor-financing stipulation (docs. 383 and 435).

In sum, when the representations of counsel and the other circumstances surrounding the September 12, 2013 hearing are considered, it is not reasonable to presume the Court or any attorney for the parties in interest contemplated professional fees would exceed the professional fee carve-out for services rendered through the closing of the packing plant sale or that the caveat in the September 16, 2013 debtor-financing order was intended to open the PASA bond and White Oak's $100,000.00 advance for the payment of the professionals' fees that were incurred before the sale closed but in excess of the professional fee carve-out. Counsel's present advancement of a contrary interpretation of the September 16, 2013 order has been disingenuous.

It is also important to consider the record *after* the September 16, 2013 order. First, during the sale process, none of the chapter 11 professionals ever formally advised other parties to the case or the Court that the original professional fee carve-out and the stipulated increases to it were no longer intended to cover all their fees through the agreed dates in the debtor-financing modifications. As the sale process–

and Debtor's need for financing from White Oak—continued, the professional fee carve-out increased (docs. 691, 730, 761, 769, 819, and 835).  Further, the motion seeking authority for the sale of the packing plant (doc. 466) still referred to the $1,000,000.00 as being "set aside for the benefit of certain classes of creditors identified in the Second DIP Agreement," though the Court, at the December 12, 2013 auction, more correctly described the $1,000,000.00 as being assigned by White Oak for distribution pursuant to the bankruptcy code's priorities (doc. 627).

Second, as the case progressed, the Creditors Committee still advanced that the professionals' fees should stay within the approved professional fee carve-out and that the asset sale carve-out was not intended to pay professionals' fees.  For example, the Creditors Committee's motion on November 1, 2013 seeking authority to apply for monthly fees referenced the approved budget for fees (doc. 525).  In the committee's December 2, 2013 objection to Cozen O'Connor's first fee application (doc. 603), the committee referenced the asset sale carve-out as needing to be determined in the lien priority adversary proceeding "for the exclusive benefit of priority wage claimants and general unsecured creditors."  The committee also expressed concern in its objection that Cozen O'Connor and Bantz, Gosch's "burn rate" regarding their budgeted fee allowance was not sustainable and indicated the professionals' fees should be "consisten[t] with the allocation parameters of approved cash collateral budgets[.]" The committee's December 13, 2013 objection to Bantz, Gosch's first fee application (doc. 638) was even stronger, with the committee arguing Bantz, Gosch "should be judicially estopped from seeking fees that bear no relationship to the projected

budgeted amounts submitted in every filed cash collateral budget."[20]   Attorney
Jakubowski iterated the professional fee carve-out was still covering the professionals'
fees at a January 9, 2014 hearing (docs. 709 and 725), when he argued on behalf of
the Creditors Committee against a motion brought by some EB-5 creditors (emphasis
added):[21]

> Well, there's a million dollars of a carve out, there's probably, by the time
> it's all over with, about a $750,000 carve out for professionals to keep
> the estate going, get all the schedules filed, get the assets figured out,
> leave the committee to determine what the preferences are, what the
> fraudulent transfers are, and we think that, you know, just kind of
> looking ahead that this case may be appropriate in terms of a plan
> (indiscernible), put the preferences and fraudulent transfers in there for
> the benefit of the estate.  *And so there's value that was obtained from
> getting the professionals involved and getting this case managed and in
> a position where we're able to wind it down and complete it.  And that's
> cost about seven fifty.  That was paid for by White Oak without
> recourse*.

Further, as the Court entered interim fee orders limiting payment of the

professionals' fees to the professional fee carve-out, especially as that fund dissipated,

---

[20]The Creditors Committee's objection to Bantz, Gosch's first fee application
included a pertinent quote:

> This maneuvering brings to mind the equitable principle of judicial
> estoppel, which precludes litigants from deliberately changing positions
> according to the exigencies of the moment, thereby prevailing in one
> phase of a case on an argument and then relying on a contradictory
> argument to prevail in another phase.

*Kimbrell v. Brown*, 651 F.3d 752, 757 (7th Cir. 2011) (internal quotations and
citations omitted).

[21]The Creditors Committee's *written* objection to the EB-5 creditors' motion was
more general, referring to the $900,000.00 PASA bond and White Oak's
$100,000.00 advance as a "tangible net cash benefit" for the estate (doc. 665).

none of the fee applicants questioned the import of those orders.  None argued the Court's caveat in the September 16, 2013 debtor-financing order had already freed up all funds to pay their fees in excess of the professional fee carve-out.  None argued Debtor, White Oak, and the Creditors Committee no longer intended the professional fee carve-out to cover all estate professionals' fees through the agreed dates in the second debtor-financing stipulation and its subsequent modifications.

The Court found three documents entered between September 12, 2013 and April 27, 2015 that may reflect the estate professionals' present interpretation of the caveat in the September 16, 2013 order.[22]  In the first, filed December 23, 2013, White Oak referred to the $1,000,000.00 from the $900,000.00 PASA bond and its $100,000.00 advance as a receipt for the "estate" upon the closing of the packing plant sale (doc. 662).  In the second, filed January 8, 2014, Bantz, Gosch requested, in response to objections to its first fee application (doc. 686), that it be allowed fees

---

[22]The Court notes the budgets attached to the subsequent modifications of the second debtor-financing stipulation no longer included a line item for chapter 11 professionals' fees (docs. 691, 761, and 819), as had the budget attached to the original stipulation that was approved and the first modification to it (docs. 360 and 532).  However, the first motion for a modification of the financing provided by White Oak (doc. 691) included specific allowances for the chapter 11 professionals' fees and referenced the funding as addressing "the likely costs of continued administration in chapter 11[.]"  The second and third motions said the additional financing would "relieve the estate of substantial administrative expenses" and included specific additional funds for Debtor's counsel's fees (docs. 761 and 819).  The stipulations attached to the three motions each referred to the "financing . . . necessary for the further administration of this Chapter 11 Case[.]"  Thus, the Court did not consider the financing modifications as documents supporting the attorneys' present interpretation of the Court's caveat in the September 16, 2013 order approving the second debtor-financing stipulation.

in excess of the budget because the budget had been "negotiated at a time when the scope of services was anticipated to be less than what ultimately was required of counsel[.]"  The firm did not, however, identify what funds should pay its fees in excess of the budget.  In the third, the settlement of the WARN Act adversary proceeding filed October 31, 2014 (doc. 976-1 at page 6), the funds in the Unsecured Creditor Escrow, which were to be used to pay the settlement, were described as being held in trust for estate claims "according to their priorities."[23]  This differs from the more general language in the June 12, 2014 settlement of Farnam Street Financial, Inc.'s administrative expense claim (doc. 927).  In that settlement, Debtor, the Creditors Committee, and Farnam Street Financial, Inc. agreed Farnam Street Financial, Inc. was to be paid "from the $1,000,000 in escrowed funds obtained following the close of the Asset Sale and held by counsel to the Committee."

When all the late 2013 through early 2015 documents filed by Debtor and the Creditors Committee are considered, however, the professionals have not demonstrated there was a universal understanding by the professionals or an authorization by or an acknowledgment from the Court that chapter 11 professionals'

---

[23]The WARN Act adversary proceeding settlement beneficiaries–Debtor's terminated employees at its packing plant–were also the original intended beneficiaries of White Oak's $100,000.00 advance in the Unsecured Creditor Escrow created within the second debtor-financing stipulation.  Consequently, the WARN Act adversary proceeding settlement funds essentially went to the same priority wage claimants, but with the funds depleted by the costs attendant to the class action adversary proceeding.  Though the wage claimants also received a $1,000,000.00 unsecured claim against the estate in the settlement, it does not appear sufficient estate funds will be available to pay a meaningful portion of that claim.

fees through April 5, 2014 were no longer intended to stay within the bounds of the professional fee carve-out or that funds in the asset sale carve-out were now expressly available to pay the professionals' fees in excess of the professional fee carve-out. Instead, those documents indicating an intention or understanding that estate professionals' fees through April 5, 2014 would be paid exclusively from the professional fee carve-out carry a greater weight than those documents reflecting the chapter 11 attorneys' present broader perspective regarding the expected amount of, and the funding source for, their fees.

Finally, the professionals' justifications for exceeding the amounts budgeted for fees through April 5, 2014 are not supported by the record. Debtor's unique financing structure, including funding obtained through the federal EB-5 program[24] and Debtor's end-stage financing deals with White Oak, were known factors when the second debtor-financing stipulation and budget were negotiated, as well as when the debtor-financing modifications were subsequently made. That Debtor and the Creditors Committee would have to deal with the EB-5 investors' opposition to the sale of the packing plant should not have surprised anyone in September 2013 and was a known factor when the financing modifications were negotiated. Most important, dealing with any objections to the proposed sale clearly fell within the scope of White Oak's commitment at the September 12, 2013 hearing to fully fund the sale process through

---

[24]Details regarding the EB-5 program were never made part of the record. *See supra* note 7.

its debtor-in-possession financing.[25]  Both the WARN Act adversary proceeding and the lien priority adversary proceeding were known factors when the debtor-financing modifications were made.  Finally, the delay in converting the case to chapter 7 affected only the post-sale, pre-conversion fees, not fees incurred through April 5, 2014.  The delay in the conversion of the case through April 5, 2014 was already accounted for in the modifications to the second debtor-financing stipulation.

For these several reasons, the chapter 11 professionals will not be awarded or paid from the funds held by Trustee Allred any additional fees for services rendered and expenses incurred through April 5, 2014.

By the Court's calculations, Cozen O'Connor and Bantz, Gosch still have $61,469.56 in fees that may be paid from the professional fee carve-out.  To the extent court-approval of these fees is necessary before the carve-out funds are released, the firms will be awarded pre-April 6, 2014 fees of $61,469.56.  This sum shall be paid only from the professional fee carve-out and should be allocated between the two firms *pro rata* based on their total fees sought through April 5, 2014.

IV.

IMPACT OF THE JUDGMENT IN THE LIEN PRIORITY ADVERSARY PROCEEDING

As stated in the interim findings, the Court wanted to more closely review the pending final fee applications of Debtor's counsel because the impact of the judgment in the lien priority adversary proceeding on the funds available to pay administrative

---

[25]Debtor's counsel's statement was even broader on September 12, 2013.  He said:  "[A]ll costs of this sale process -- in fact, all costs of the bankruptcy process are being born by White Oak[.]"

-28-

expenses, including the attorneys' fees, was unclear.  The same issue affects the payment of fees previously awarded to counsel for the Creditors Committee.  After Trustee Allred's identification of the sources of the funds he has on hand and the parties' evidence and arguments regarding the committee's lien, however, the record regarding this issue is only a bit clearer.

Before the April 27, 2016 final fee hearing, Cozen O'Connor opined in its brief that the Court's caveat in the September 16, 2013 debtor-financing order prevented the lien given to the Creditors Committee from segregating any funds exclusively for certain types of claim holders (doc. 1451).  Robbins, Salomon and Dougherty & Dougherty did not discuss the effect of the lien priority judgment in their pre-hearing brief (doc. 1450).

During his testimony, Attorney Silton of Cozen O'Connor stated whether White Oak continued to hold a lien against Debtor's personal property at the time of the lien priority adversary proceeding was "a really complicated question."  He could not recall the specifics of the lien priority judgment or White Oak's assignment to the Creditors Committee, but stated:

> [S]ome times during the [lien priority] litigation[,] White Oak continued to have liens on the property of the Debtor.  As part of the [second debtor-financing] stipulation, they gave up some . . . liens.  Right after the sale those liens would have been released and then would have continued on to the new  - - with the new entity.  That's the whole kind of the nature of a 363 sale.
>
> . . . .
>
> And you're also - - it also gets into issues of lien stripping and a lot of those other issues.  And some of it was contractually gave up, some of it legally they didn't have.

-29-

Thus, the import of his testimony regarding the lien priority judgment remained unclear.

Attorney Jakubowski of Robbins, Salomon testified at somewhat greater length regarding the lien priority judgment. He acknowledged the Creditors Committee initially received a lien as part of the second debtor-financing stipulation, and he opined it was the judgment in the lien priority adversary proceeding that "enabled the [Creditors] Committee to be able to transfer it to the estate for the benefit of the estate, and that happened after the conversion." Attorney Jakubowski further opined that only through the lien priority adversary proceeding was it finally resolved that White Oak had a lien on the PASA bond and that White Oak's interest in the bond transferred to the Creditors Committee "as a result of the successful conclusion of the adversary in favor of the unsecured creditors."

In their post-hearing brief (doc. 1480), Robbins, Salomon and Dougherty & Dougherty opined that after the PASA bond was deposited in the Unsecured Creditor Escrow and after the sale of the packing plant, the only remaining estate asset was the personal property subject to dispute with RockTenn. The firms noted that dispute was resolved by a court-approved stipulation with RockTenn, wherein the estate received $20,000.00 and the assigned lien was removed from the subject personalty. The firms seemingly argued the RockTenn settlement, coupled with the Court's caveat in the September 16, 2013 debtor-financing order, created the basis for the funds in the asset sale carve-out, which included the PASA bond, going to Trustee Allred for the benefit of the estate upon conversion. Robbins, Salomon and Dougherty & Dougherty further argued–for the first time, as best the Court can discern–that the lien

assigned by White Oak to the Creditors Committee has no value because there were no assets in the estate following entry of the judgment in the lien priority adversary proceeding to which the assigned lien could attach.    In its post-hearing brief (doc. 1489), Cozen O'Connor, in a footnote, adopted Robbins, Salomon and Dougherty & Dougherty's new theory.[26]

White Oak's April 24, 2014 Transfer of Claim Other Than for Security, through its assignee, to the Creditors Committee reflected the second debtor-financing stipulation regarding White Oak's assignment of its secured claim to the Creditors Committee (doc. 885, at page 2 of the attached "Agreement and Evidence of Transfer of Claim").  The transfer of claim, however, also referenced White Oak's lien on the PASA bond that was initially included in White Oak's "DIP Lien" in the second debtor-financing stipulation, which White Oak also transferred, via its assignee, to the Creditors Committee.    The Court was unable to find where the chapter 11 professionals discussed White Oak's transfer of claim at the April 27, 2016 hearing or in their pre- or post-hearing briefs.

In their post-hearing brief (doc. 1480), the Creditors Committee's attorneys used "Assigned Lien Claim" as a term of art referring to White Oak's assignment of its remaining secured claim to the committee in the second debtor-financing stipulation

---

[26]The chapter 11 attorneys' latest theory–that the Creditors Committee's lien from the judgment in the lien priority adversary proceeding had nothing to attach to–faces a timeline hiccup since the settlement with RockTenn was approved December 1, 2015 (doc. 1359), several months *after* the April 14, 2015 judgment was entered in the lien priority adversary proceeding.

(doc. 360 at page 11).  The Creditors Committee's lien recognized in the judgment from the lien priority adversary proceeding arose from this assignment.  It does not appear the judgment in the lien priority adversary proceeding also reflected White Oak's April 24, 2014 transfer, through its assignee, to the Creditors Committee of its lien on the PASA bond (doc. 360 at page 7).

On this less than definitive record, the Court can only return to the caveat in the September 16, 2013 order that provides the property being transferred by White Oak under the second debtor-financing stipulation should be distributed according to the bankruptcy code's priorities.  Further, in the absence of any evidence identifying specific property to which the Creditors Committee's lien remains attached, and in light of the settlement of RockTenn's property interests, the Court concludes whatever lien interests the committee obtained—through the second debtor-financing stipulation, as modified by the September 16, 2013 order, through White Oak's transfer of claim, and through the judgment in the lien priority adversary proceeding—have melded into a general estate asset.  Trustee Allred may, therefore, use the funds he has on hand to pay, pursuant to the bankruptcy code's priorities, administrative expenses and allowed claims against the estate, excluding the fee claims for the chapter 11 professionals for services rendered and expenses incurred before April 6, 2014, as discussed above.

The Court will not impose the equitable lien requested by the United States Trustee.  This issue was neither raised timely nor raised by complaint, as required by Fed.R.Bankr.P. 7001(7).  The Court also will not, in this fee decision, subordinate any

priority claim held by the Internal Revenue Service or the South Dakota Department of Revenue, as urged by Robbins, Salomon. Those, too, are matters that must be raised through an adversary proceeding. Fed.R.Bankr.P. 7001(8).

V.

ALLOWABLE FEES FOR APRIL 6, 2014 TO APRIL 27, 2015

*Cozen O'Connor*. The Court will, under § 330(a), allow Cozen O'Connor compensation for services rendered and attendant expenses for its post-sale, pre-conversion services that were reasonably likely to benefit Debtor's estate or were necessary to the administration of the case at the time the services were provided, regardless of whether the services increased the funds available for unsecured claimants. *In re Blue Stone Real Estate*, 487 B.R. 573, 577-78 (Bankr. M.D. Fla. 2013), *cited in Miller Automotive Group*, 521 B.R. at 326-27. Determining the amount of those fees, however, was difficult for two reasons.

Foremost, all the firm's categorized services have more than a few entries that were seemingly miscategorized and other services that could have been placed in a particular category but were left in more general sections.[27] This includes the firm's itemization of services regarding the avoidable transfer actions, where Cozen O'Connor did not fully separate all the services rendered for each of the avoidable transfer

---

[27]After considering Cozen O'Connor's original final fee application (doc. 1195) and its two supplements (docs. 1376 and 1496), it appears the firm's itemization of services for its final fee period now consists of document 1195-1, pages 1 through 10 and 29 through 34, and document 1496-2, pages 11 through 23. The itemizations do not reflect the firm's voluntary hourly rate adjustments (capping attorney rates at $480.00 per hour and capping paralegal rates at $175.00 per hour).

actions it commenced or considered.   While the firm provided three separate itemizations for the three avoidable transfer actions it commenced, the firm also provided a fourth itemization labeled "Adversary Proceedings - General Preference," described in its second supplement to its final fee application (doc. 1496) as "fees incurred with respect to preference actions generally[.]"   Some entries in this general category could have been tied to a particular avoidable transfer adversary proceeding. Second, entries related to preparing the firm's fee application were disbursed throughout the categorized itemizations, in addition to being in the category labeled "Employment of Professionals."   Since the record does not disclose how the firm determined which services were placed in which category or why similar services ended up under different categories, the Court was left to work with the itemizations as provided and apply the relevant factors supplied by § 330(a)(3)[28] and (a)(4)(A).[29]

---

[28]The factors provided by 11 U.S.C. § 330(a)(3) are:

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

Based on its review of Cozen O'Connor's itemization and § 330(a)(3), the Court will disallow several entries throughout the firm's fee itemization because the services were related to the SOD litigation, which Cozen O'Connor has agreed will not be paid from funds held by Trustee Allred.[30]   This includes the legal work necessary for Attorney Thomas P. Kane to be admitted *pro hac vice* before the trial on SOD's claim and the fee for his *pro hac vice* admission since his appearances on May 27-30, 2014, June 2, 2014, and November 6, 2014 all related to the SOD claim litigation.[31]

The Court will also disallow a number of entries for services by paraprofessionals that were clerical in nature, including the general updating and

_____

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

[29]Section 330(a)(4)(A) of the bankruptcy code provides:

Except as provided in subparagraph (B), the court shall not allow compensation for—
    (i) unnecessary duplication of services; or
    (ii) services that were not—
        (I) reasonably likely to benefit the debtor's estate; or
        (II) necessary to the administration of the case.

[30]Cozen O'Connor, in its second supplement to its final fee application, removed the itemization category for the SOD litigation, which had been Exhibit I attached to its original final fee application.  The SOD-related services disallowed herein were not included on Exhibit I.

[31]Attorney Kane's appearances regarding SOD's claim were in both the lien priority adversary proceeding and Debtor's main bankruptcy case.  Attorney Kane also appeared for Cozen O'Connor at the April 27, 2016 hearing on his firm's fees, but those services are not compensable from the estate.  *Baker Botts L.L.P. v. ASARCO LLC*, ___ U.S. ___, 135 S.Ct. 2158, 2164-69 (2015).

organizing of files and processing large mailings. These are support staff tasks that should be included in the firm's overhead, not charged out at $180.00 per hour. *See, e.g., In re Keeley and Grabanski Land Partnership*, Bankr. No. 10-31482, 2016 WL 1317395, at *7 (Bankr. D.N.D. Mar. 31, 2016).

For those services related to preparing the firm's final fee application, the Court will allow half the hours sought for the firm's principal paralegal on this case, Amy E. Kulbeik, since the professional versus clerical nature of the 153.5 hours she spent on applications was not adequately demonstrated. The problem is similar with the 15.5 hours expended by Attorney Wallrich and the 7.5 hours expended by Attorney Silton: The record does not establish why substantial hours by these attorneys at their substantial rates were necessary to prepare the applications.[32] Half their requested hours related to the fee applications will be allowed. Finally, Cozen O'Connor sought fees for reviewing objections to its fee application and attending the hearing thereon. Under *Baker Botts L.L.P. v. ASARCO LLC*, ___ U.S. ___, 135 S.Ct. 2158, 2164-69 (2015), fees for those services are not compensable from the estate and must be disallowed.

---

[32]Cozen O'Connor itemized services regarding Lincoln Partners' fee applications. While no adjustments will be made in this case for these services, the Court notes its concern that a debtor-in-possession, a trustee, or an attorney for a debtor-in-possession or a trustee may compromise his or her fiduciary obligation to the estate if he or she does more than just *electronically file* a fee application for another estate professional. *See* Bankr. D.S.D. R. 2016-2(a). Moreover, the costs attendant to preparing Lincoln Partners' fee applications should have been set forth in Lincoln Partners' applications, and once Lincoln Partners retained counsel, its own attorney should have filed the subsequent final fee application.

As to the two avoidable transfer adversary proceedings regarding Avera Health Plans, Inc. and Northwestern Energy Corporation that Debtor commenced pre-conversion and Trustee Allred settled post-conversion, the Court will award Cozen O'Connor fees based on the affected firms' proposed allocation, which proposed Cozen O'Connor receive a total of $11,130.00 for both matters (doc. 1522).  The firms' proposed allowance is reasonable and not excessively higher than what would have been awarded if the firms had been employed under this district's oft-utilized one-third contingency fee for such matters that do not go to trial, plus reasonable expenses and sales tax.  Their proposed allowance also reflects the results obtained.

As to the avoidable transfer action Debtor commenced pre-petition against Quality Value Excellent Sanitation Team, LLC that was later voluntarily dismissed, the Court will allow Cozen O'Connor its itemized fees, less the deductions for services discussed above related to SOD's claim, the nonprofessional services, and the excessive time for preparation of fee applications.  The Court will not apply a one-third contingency fee since the firm was not employed on a contingent fee basis for avoidable transfer actions, the fees sought for this matter are not excessive, and the allowed fees do not need to be apportioned among different firms rendering pre- and post-conversion services.

As to the WARN Act adversary proceeding, the lien priority adversary proceeding, and the categorized services related to the United States Trustee, the use, sale, and lease of property, motions, and petition and schedules, the Court will allow Cozen O'Connor's fees as requested for April 6, 2014 to April 27, 2015, less the

deductions for services discussed above related to SOD's claim, the nonprofessional services, and the excessive time for preparation of fee applications. The fees particular to these matters are within the range of reasonableness and were necessary to the administration of the estate.

Cozen O'Connor's post-sale, pre-conversion "General Administration" services and its "Adversary Proceedings - General Preference" services present the most challenges, principally because, as noted above, some services listed in these general categories could have been placed in one of the more particular categories and then more readily considered under § 330(a). These two categories are also difficult to review because similar work done by professionals or paraprofessionals, sometimes near the same time, made their way to different categories–often in one of the general categories and then in one or more of the particularized categories. For example, services regarding amendments to schedules, dealing with employees' addresses and claims, and the lien priority adversary proceeding can be found under at least three different categories. These two categories also contained a notable number of services by Cozen O'Connor's higher-rate attorneys, whose services too often consisted only of reviewing the files or reviewing the work of others, which was at the heart of Trustee Allred's objection regarding duplicative services.

Based on this review, the Court will reduce by 75% the total hourly compensation sought by Cozen O'Connor for the services rendered by Attorney Silton set forth in the firm's itemizations for "Exhibit A - General Administration" and "Exhibit (B)(4) - Adversary Proceedings - General Preference." This reduction is made because

Attorney Silton's services in these categories consisted largely of reviewing and analyzing files and the work of others without a discernable production of necessary documents or the advancement of a necessary legal process.  In addition, the record does *not* show Cozen O'Connor, as Debtor's principal bankruptcy counsel, was addressing several complex legal matters at once, which might have justified several attorneys working on those matters at the same time.  Instead, the firm was presented with the post-petition debtor-financing, the packing plant sale, the SOD litigation, the WARN Act adversary proceeding, the avoidable transfer actions, the usual chapter 11 administrative matters, and dealing with former employees' questions and concerns.  The packing plant sale was largely driven by White Oak's counsel.  The SOD litigation and the avoidable transfers were not complex legal matters but instead more fact-intensive.  Addressing former employees' questions and improving the case mailing list were not legally complex issues, but rather time-consuming matters that were appropriately handled by paraprofessionals.  Only the debtor-financing matters and perhaps the WARN Act adversary proceeding were sufficiently complex to justify more than one attorney from Cozen O'Connor working on those matters at the same time.

The Court will further reduce by 50% the total hourly compensation sought by Cozen O'Connor set forth in "Exhibit (B)(4) - Adversary Proceedings - General Preference."  The compensation in excess of $100,000.00 sought by the firm for its work on the avoidable transfer actions – Exhibits (B)(4), B(5), B(6), and B(7) – is excessive in light of the complexity of the three actions the firm brought pre-conversion and the results obtained:  a total recovery of $85,000.00 in two of the

three adversary proceedings and a voluntary dismissal of the third.  Second, Cozen O'Connor is already generously receiving $11,130.00 for its work on the avoidable transfer actions against Avera Health Plans, Inc. and Northwestern Energy Corporation based on Exhibits B(5) and B(6).  Third, the Court is unable to discern from the record, including the fee applications filed by Trustee Allred's counsel, that Cozen O'Connor's pre-conversion work on the estate's avoidable transfer actions meaningfully assisted Trustee Allred's counsel in commencing and resolving the eight additional avoidable transfer adversary proceedings he commenced post-conversion.  Finally, a notable portion of the other professionals' and paraprofessionals' time on Exhibit (B)(4), in addition to Attorney Silton's, consisted of reviewing files and interoffice communications, making identification of the actual work produced difficult.

In addition to the voluntary expense reduction of $3,205.93 Cozen O'Connor identified in its second supplement to its final fee application for secretarial overtime, meals, Westlaw charges, and XACT copy charges on November 10, 2014 (doc. 1496-1), one additional deduction to the expenses sought by Cozen O'Connor for its final fee period will be made, as noted above:  $100.00 for Attorney Kane's *pro hac vice* fee on April 11, 2014 that was related to the SOD litigation.  Allowed expenses for the firm's final fee period are thus $7,077.72.

After these deductions, Cozen O'Connor is awarded, for the final fee period of April 6, 2014 to April 27, 2015, $140,697.51 for compensation for services, $7,077.72 for reimbursement of expenses, and $8,441.85 for sales tax, for a total

fee allowance of $156,217.08, as detailed in Attachment 1.[33]  Trustee Allred will be authorized to pay this sum from the funds on hand.

*Robbins, Salomon and Dougherty & Dougherty*.  The Creditors Committee's attorneys' previously allowed fees for post-sale, pre-conversion services and related expenses total $11,768.40 for Dougherty & Dougherty (docs. 970 [in part], 1085, and 1137) and $42,422.67 for Robbins, Salomon (doc. 1227).  Because these fees were previously found to comply with the requirements of § 330(a) and awarded and because these services protected the Creditors Committee's interests in the WARN Act adversary proceeding, the lien priority adversary proceeding, the avoidable transfer actions, and the RockTenn issues, and also fostered a smoother conversion, Trustee Allred is authorized to pay Robbins, Salomon and Dougherty & Dougherty their post-sale, pre-conversion fees from the funds he has on hand.

The figure above reflects two minor adjustments made to the post-sale, pre-conversion fees previously awarded Dougherty & Dougherty.  It appears both the firm's final fee application (doc. 1135) and the order regarding that application (doc.

---

[33]On Attachment 1, those services disallowed as nonprofessional in nature are highlighted in green, those services allowed at half rate regarding preparation of fee applications are highlighted in rose, those services disallowed as related to the SOD litigation are highlighted in yellow, and those services disallowed pursuant to *Baker Botts L.L.P. v. ASARCO LLC*, ___ U.S. ___, 135 S.Ct. 2158, 2164-69 (2015), are highlighted in orange.  In reviewing Cozen O'Connor's itemization, the Court found several entries where the total time expended on a particular day by a particular attorney or paraprofessional was incorrect.  Each figure was corrected on Attachment 1–sometimes up and sometimes down.  The allowed compensation also reflects the firm's voluntary cap of attorney fees at $480.00 per hour and paralegal fees at $175.00 per hour.

1137) excluded $75.00 for services and $4.50 for sales tax for the invoice dated May 5, 2015. Further, one-tenth of an hour from the invoice dated May 5, 2015 needs to be deducted for the firm's services on April 28, 2015, as that particular service was rendered post-conversion and was not related to preparation of the firm's final fee application. After these two adjustments, the total fee under Dougherty & Dougherty's final fee application for chapter 11 services that Trustee Allred will be authorized to pay is $874.50, which is included in the $11,768.40 total above.

*Bantz, Gosch*. On the present record, the Court is unable to award additional fees to Bantz, Gosch. While the application to employ the firm and the firm's affidavit in support of the application was thorough and indicated the firm had represented *Debtor* pre-petition (doc. 13), the firm's billing statements indicate it had previously represented Northern Beef Packers Management, LLC (docs. 579 at page 3 and 1357 at page 8), which Debtor identified as its general partner holding a 40% interest (doc. 105 at page 131). On the present record, Bantz, Gosch's prior representation of Debtor's general partner, particularly one who is a co-debtor (doc. 105 at page 122), disqualifies the firm from representing Debtor under § 327(a). *In re Kappy Investments, Inc.*, 465 B.R. 839, 841-43 (Bankr. D. Minn. 2012); *see Needler v. Rendlen* (*In re Big Mac Marine, Inc.*), 326 B.R. 150 (B.A.P. 8th Cir. 2005); and *In re Keeley and Grabanski Land Partnership*, Bankr. No. 10-31482, 2013 WL 2384100, at *4-6 (Bankr. D.N.D. May 30, 2013).

That the firm's efforts may not have been focused exclusively on Debtor's estate is also reflected by the record. Some of Bantz, Gosch's itemized services

expressly demonstrate the firm's attention was divided among Debtor, its general partner, and Oshik Song–a limited partner and a general unsecured creditor.  Other services addressed political concerns and media inquiries surrounding the EB-5 program and assisting persons involved in that program, all of which bore little relevance to a liquidating debtor, especially once the packing plant had been sold at auction.

Because this issue was not raised previously, Bantz, Gosch may request an evidentiary hearing to establish it was qualified to represent Debtor in the chapter 11 as general counsel under § 327(a).  Absent such a request, however, the firm will not receive additional fees from the funds held by Trustee Allred.  Bantz, Gosch may retain the fees it previously received from the professional fee carve-out since those funds were provided by White Oak and, as discussed above, may also receive a *pro rata* share of any funds remaining in the professional fee carve-out for Debtor's counsel.[34]

Appropriate orders will be entered.

Dated:  August 29, 2016.

BY THE COURT:

Charles L. Nail, Jr.
Bankruptcy Judge

**NOTICE OF ENTRY**
Under Fed.R.Bankr.P. 9022(a)

This order/judgment was entered
on the date shown above.

Frederick M. Entwistle
Clerk, U.S. Bankruptcy Court
District of South Dakota

---

[34]The record does not reflect why White Oak furnished Cozen O'Connor fees to litigate the SOD claim but did not provide any to Bantz, Gosch for serving as Cozen O'Connor's necessary local counsel.  D.S.D. Civ. LR 83.2(E); Bankr. D.S.D. R. 2090-1.  The Court leaves it to those entities to decide whether Bantz, Gosch should receive a share of the $175,000.00.